## LYNCH *v.* OVERHOLSER, HOSPITAL SUPERINTENDENT.

No. 159.   Argued January 15, 1962.—Decided May 21, 1962.

*Richard Arens* argued the cause for petitioner.   With him on the briefs was *Rufus King*.

*Assistant Attorney General Marshall* argued the cause for respondent.   With him on the briefs were *Solicitor General Cox, Richard J. Medalie, Harold H. Greene* and *David Rubin*.

Briefs urging reversal were filed by *Francis M. Shea* and *Lawrence Speiser* for the American Civil Liberties Union, as *amicus curiae*.

MR. JUSTICE HARLAN delivered the opinion of the Court.

This is a habeas corpus proceeding instituted in the District Court by the petitioner, presently confined in Saint Elizabeths Hospital for the insane pursuant to a commitment under D. C. Code § 24–301 (d), to test the legality of his detention. The District Court, holding that petitioner had been unlawfully committed, directed his release from custody unless civil commitment proceedings (D. C. Code § 21–310) were begun within 10 days of the court's order. The Court of Appeals, sitting *en banc,* reversed by a divided vote. 109 U. S. App. D. C. 404, 288 F. 2d 388. Since the petition for certiorari raised important questions regarding the procedure for confining the criminally insane in the District of Columbia and suggested possible constitutional infirmities in § 24–301 (d) as applied in the circumstances of this case, we granted the writ. 366 U. S. 958.

Two informations filed in the Municipal Court for the District of Columbia on November 6. 1959, charged petitioner with having violated D. C. Code § 22–1410 by drawing and negotiating checks in the amount of $50 each with knowledge that he did not have sufficient funds or credit with the drawee bank for payment. On the same day, petitioner appeared in Municipal Court to answer these charges and a plea of not guilty was recorded. He was thereupon committed under D. C. Code § 24–301 (a) to the District of Columbia General Hospital for a mental examination to determine his competence to stand trial.[1] On December 4, 1959, the Assistant Chief Psychiatrist of

---

[1] The record does not reveal the basis for the trial court's action.

the Hospital reported that petitioner's mental condition was such that he was then "of unsound mind, unable to adequately understand the charges and incapable of assisting counsel in his own defense." The case was continued while petitioner was given treatment at the General Hospital.

On December 28, 1959, the Assistant Chief Psychiatrist sent a letter to the court advising that petitioner had "shown some improvement and at this time appears able to understand the charges against him, and to assist counsel in his own defense." This communication also noted that it was the psychiatrist's opinion that petitioner "was suffering from a mental disease, i. e., a manic depressive psychosis, at the time of the crime charged," such that the crime "would be a product of this mental disease." As for petitioner's current condition, the psychiatrist added that petitioner "appears to be in an early stage of recovery from manic depressive psychosis," but that it was "possible that he may have further lapses of judgment in the near future." He stated that it "would be advisable for him to have a period of further treatment in a psychiatric hospital."

Petitioner was brought to trial the following day in the Municipal Court before a judge without a jury. The record before us contains no transcript of the proceedings,[2] but it is undisputed that petitioner, represented by counsel, sought at that time to withdraw the earlier plea of not guilty and to plead guilty to both informations. The trial judge refused to allow the change of plea, apparently on the basis of the Hospital's report that petitioner's commission of the alleged offenses was the product of mental illness.

---

[2] Despite the absence of a trial record, the District Court made findings of fact respecting the proceedings at petitioner's trial, some of which are contested by the parties. We rely only upon those facts that were here admitted.

At the trial one of the prosecution's witnesses, a physician representing the General Hospital's Psychiatric Division, testified, over petitioner's objection, that petitioner's crimes had been committed as a result of mental illness. Although petitioner never claimed that he had not been mentally responsible when the offenses were committed and presented no evidence to support an acquittal by reason of insanity, the trial judge concluded that petitioner was "not guilty on the ground that he was insane at the time of the commission of the offense."[3] The court then ordered that petitioner be committed to Saint Elizabeths Hospital as prescribed by D. C. Code § 24–301 (d), which reads:

> "(d) If any person tried upon an indictment or information for an offense, or tried in the juvenile court of the District of Columbia for an offense, is acquitted solely on the ground that he was insane at the time of its commission, the court shall order such person to be confined in a hospital for the mentally ill."

There can be no doubt as to the effect of this provision with respect to a defendant who has asserted a defense of insanity at some point during the trial. By its plain terms it directs confinement in a mental hospital of any criminal defendant in the District of Columbia who is "acquitted solely on the ground" that his offense was committed while he was mentally irresponsible, and forecloses the trial judge from exercising any discretion in this regard. Nor does the statute require a finding by the trial judge or jury, or by a medical board, with respect to the accused's mental health on the date of the judgment of acquittal. The sole necessary and sufficient condition for bringing the compulsory commitment provision into

---

[3] Petitioner did not appeal from this judgment.

play is that the defendant be found not guilty of the crime with which he is charged because of insanity "at the time of its commission." [4]  Petitioner does not contend that the statute was misinterpreted in these respects.

Petitioner maintains, however, that his confinement is illegal for a variety of other reasons, among which is the assertion that the "mandatory commitment" provision, as applied to an accused who protests that he is presently sane and that the crime he committed was not the product of mental illness, deprives one so situated of liberty without due process of law. [5]  We find it unnecessary to con-

[4] Similar statutes are found in 12 States, the Virgin Islands, and in England. Compare Colo. Rev. Stat. Ann. (Supp. 1957) § 39–8–4; Ga. Code Ann., 1953, § 27–1503; Kan. Gen. Stat. Ann., 1949, § 62–1532; Maine Pub. L., 1961, c. 310; Mass. Ann. Laws, 1957, c. 123, § 101 (murder or manslaughter); Mich. Stat. Ann., 1954, § 28.933 (3) (murder); Minn. Stat. Ann. (Supp. 1957) § 631.19; Neb. Rev. Stat. Ann., 1943, § 29–2203; Nev. Rev. Stat., 1955, § 175.445; N. Y. Sess. Laws 1960, c. 550, §§ 1–3; Ohio Rev. Code (Baldwin 1953) § 2945.39; Wis. Stat., 1958, § 957.11; V. I. Code Ann., 1957, Tit. 5, § 3637. The English procedure is found in Trial of Lunatics Act, 46 & 47 Vict., c. 38, s. 2 (1883).

Statutes under which commitment is mandatory if the trial judge or jury finds that the accused is *presently* insane are, of course, clearly distinguishable. The focus of the inquiry on which commitment turns is the accused's mental health as of the time of commitment, and the verdict of not guilty by reason of insanity is merely evidence bearing on that issue. Consequently, the effect of the compulsory aspect of such a commitment provision is by no means comparable to that involved in the present case. Similarly, any discretionary commitment statute presumably leaves the trial judge or jury free to find the accused presently sane and thus entitled to full liberty.

[5] In essence the claim is that § 24–301 (d) compels the indeterminate commitment of such a person without any inquiry as to his present sanity, and solely on evidence sufficient to warrant a reasonable doubt as to his mental responsibility as of the time he committed the offense charged. The claim is said to be buttressed when § 24–301 (d) is taken in conjunction with the rigorous release-from-

sider this and other constitutional claims concerning the fairness of the Municipal Court proceeding, since we read § 24-301 (d) as applicable only to a defendant acquitted on the ground of insanity who has affirmatively relied upon a defense of insanity, and not to one, like the petitioner, who has maintained that he was mentally responsible when the alleged offense was committed.[6]

The decisions of this Court have repeatedly warned against the dangers of an approach to statutory construction which confines itself to the bare words of a statute, e. g., *Church of the Holy Trinity* v. *United States*, 143 U. S. 457, 459–462; *Markham* v. *Cabell*, 326 U. S. 404, 409, for "literalness may strangle meaning," *Utah Junk Co.* v. *Porter*, 328 U. S. 39, 44. Heeding that principle we conclude that to construe § 24-301 (d) as applying only to criminal defendants who have interposed a defense of insanity is more consistent with the general pattern of laws governing the confinement of the mentally ill in the District of Columbia, and with the congressional policy that impelled the enactment of this mandatory commitment provision, than would be a literal reading of the section. That construction finds further support in the rule

---

confinement provisions of § 24-301 (e) and § 24-301 (g) as construed by the Court of Appeals for the District of Columbia in *Overholser* v. *Leach*, 103 U. S. App. D. C. 289, 257 F. 2d 667; *Ragsdale* v. *Overholser*, 108 U. S. App. D. C. 308, 281 F. 2d 943.

[6] The defense of insanity need not, of course, be asserted by means of a formal plea. Fed. Rules Crim. Proc. 11, which governs proceedings in the District Courts, permits the entry of certain enumerated pleas, not including "not guilty by reason of insanity," a plea which is authorized in some jurisdictions. D. C. Munic. Ct. Crim. Rule 9 is identical to Fed. Rules Crim. Proc. 11. Consequently, a defense of insanity in a criminal proceeding in the District of Columbia may be established under a general plea of not guilty. We read § 24-301 (d) as making commitment mandatory whenever the defendant successfully relies, in any affirmative way, on a claim that he was insane at the time of commission of the crime of which he is accused.

that a statute should be interpreted, if fairly possible, in such a way as to free it from not insubstantial constitutional doubts. *E. g., United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401; *International Assn. of Machinists* v. *Street,* 367 U. S. 740, 749. Such doubts might arise in this case were the Government's construction of § 24–301 (d) to be accepted.

## I.

To construe § 24–301 (d) as requiring a court, without further proceedings, automatically to commit a defendant who, as in the present case, has competently and advisedly not tendered a defense of insanity to the crime charged and has not been found incompetent at the time of commitment is out of harmony with the awareness that Congress has otherwise shown for safeguarding those suspected of mental incapacity against improvident confinement.

Thus, a civil commitment must commence with the filing of a verified petition and supporting affidavits. D. C. Code § 21–310. This is followed by a preliminary examination by the staff of Saint Elizabeths Hospital, a hearing before the Commission on Mental Health, and then another hearing in the District Court, which must be before a jury if the person being committed demands one. D. C. Code § 21–311. At both of these hearings representation by counsel or by a guardian *ad litem* is necessary. *Dooling* v. *Overholser,* 100 U. S. App. D. C. 247, 243 F. 2d 825, construing D. C. Code §§ 21–308, 21–311. The burden of proof is on the party seeking commitment, and it is only if the trier of fact is "satisfied that the alleged insane person is insane," that he may be committed "for the best interest of the public and of the insane person." D. C. Code § 21–315.[7]

---

[7] A police officer may arrest and detain any person who appears to be of unsound mind on the belief that if such person is "permitted to remain at large or to go unrestrained in the District of Columbia

Likewise, Congress has afforded protection from improvident commitment to an accused in a criminal case who appears to the trial court "from the court's own observations, or from prima facie evidence submitted to the court . . . [to be] of unsound mind or . . . mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense." D. C. Code § 24–301 (a). In such circumstances preliminary commitment for a "reasonable period" is authorized in order to permit observation and examination. If the medical report shows that the accused is of unsound mind, the court may "commit by order the accused to a hospital for the mentally ill *unless* the accused or the Government objects." (Emphasis added.) In case of objection, there must be a judicial determination with respect to the accused's mental health, and it is only "if the court shall find the accused to be then of unsound mind or mentally incompetent to stand trial" that an order for continued commitment is permissible. Hence if the accused denies that he is mentally ill, he is entitled to a judicial determination of his present mental state despite the hospital board's certification that he is of unsound mind. And it should be noted that the burden rests with the party seeking commitment to prove that the accused is "then of unsound mind." D. C. Code § 24–301 (a).

Considering the present case against this background, we should be slow in our reading of § 24–301 (d) to attribute to Congress a purpose to compel commitment of

the rights of persons and of property will be jeopardized or the preservation of public peace imperiled and the commission of crime rendered probable." D. C. Code § 21–326. However, within 48 hours of such apprehension, the petition that is otherwise required for an involuntary commitment must be filed, and the procedural machinery which follows the filing of such a petition must be set in motion. D. C. Code § 21–311, par. 3.

an accused who never throughout the criminal proceedings suggests that he is, or ever was, mentally irresponsible.[8] This is the more so when there is kept in mind the contrast between the nature of an acquittal by reason of insanity and the finding of insanity required in other kinds of commitment proceedings. In the District of Columbia, as in all federal courts, an accused "is entitled to an acquittal of the specific crime charged if upon all the evidence there is reasonable doubt whether he was capable in law of committing crime." *Davis* v. *United States,* 160 U. S. 469, 484. See, *e. g., Isaac* v. *United States,* 109 U. S. App. D. C. 34, 284 F. 2d 168. Compare *Leland* v. *Oregon,* 343 U. S. 790. Consequently, the trial judge or jury must reach a judgment or verdict of not guilty by reason of insanity even if the evidence as to mental responsibility at the time the offense was committed raises no more than a reasonable doubt of sanity. If § 24–301 (d) were taken to apply to petitioner's situation, there would be an anomalous disparity between what

---

[8] In eight of the 13 other American jurisdictions where statutes providing for mandatory commitment, following an acquittal by reason of insanity, are in effect, see note 4, *supra,* the provisions of the statutes indicate that they are to apply *only* if an insanity defense is interposed by the accused: Colorado ("in a trial involving the plea of not guilty by reason of insanity"); Georgia ("in all criminal trials . . . wherein an accused shall contend that he was insane"); Nebraska (accused "may plead that he is not guilty by reason of insanity or mental derangement"); Nevada ("where on a trial a defense of insanity is interposed by the defendant"); New York ("when the defense is insanity of the defendant"); Ohio ("when a defendant pleads 'not guilty by reason of insanity' "); Wisconsin ("no plea that the defendant . . . was insane . . . shall be received unless it is interposed at the time of arraignment"); Virgin Islands ("if the defense is the mental illness of the defendant"). We have not been referred to any case in the remaining American jurisdictions or in England where a mandatory commitment of this nature, following a proceeding in which the defendant did not interpose a defense of insanity, was sustained.

§ 24–301 (d) commands and what § 24–301 (a) forbids. On the one hand, § 24–301 (d) would *compel* posttrial commitment upon the suggestion of the Government and over the objection of the accused merely on evidence introduced by the Government that raises a reasonable doubt of the accused's sanity as of the time at which the offense was committed. On the other hand, § 24–301 (a) would *prohibit* pretrial commitment upon the suggestion of the Government and over the objection of the accused, although the record contained an affirmative medical finding of present insanity, unless the Government is able to prove, by a preponderance of the evidence, that the accused is presently of unsound mind.

Of course the posttrial commitment of § 24–301 (d) presupposes a determination that the accused has committed the criminal act with which he is charged, whereas pretrial commitment antedates any such finding of guilt. But the fact that the accused has pleaded guilty or that, overcoming some defense other than insanity, the Government has established that he committed a criminal act constitutes only strong evidence that his continued liberty could imperil "the preservation of public peace." It no more rationally justifies his indeterminate commitment to a mental institution on a bare reasonable doubt as to past sanity than would any other cogent proof of possible jeopardy to "the rights of persons and of property" in any civil commitment. Compare note 7, *supra.*

Moreover, the literal construction urged here by the Government is quite out of keeping with the congressional policy that underlies the elaborate procedural precautions included in the civil commitment provisions. It seems to have been Congress' intention to insure that only those who need treatment and may be dangerous are confined; committing a criminal defendant who denies the existence of any mental abnormality merely on the

basis of a reasonable doubt as to his condition at some earlier time is surely at odds with this policy.

The criminal defendant who chooses to claim that he was mentally irresponsible when his offense was committed is in quite a different position. It is true that he may avoid the ordinary criminal penalty merely by submitting enough evidence of an abnormal mental condition to raise a reasonable doubt of his responsibility at the time of committing the offense. Congress might have thought, however, that having successfully claimed insanity to avoid punishment, the accused should then bear the burden of proving that he is no longer subject to the same mental abnormality which produced his criminal acts. Alternatively, Congress might have considered it appropriate to provide compulsory commitment for those who successfully invoke an insanity defense in order to discourage false pleas of insanity. We need go no further here than to say that such differentiating considerations are pertinent to ascertaining the intended reach of this statutory provision.

## II.

The enactment of § 24–301 (d) in 1955 was the direct result of the change in the standard of criminal responsibility in the District of Columbia wrought by *Durham* v. *United States,* 94 U. S. App. D. C. 228, 214 F. 2d 862. That decision provoked a congressional re-examination of the laws governing commitment of the criminally insane. "Apprehension that *Durham* would result in a flood of acquittals by reason of insanity and fear that these defendants would be immediately set loose led to agitation for remedial legislation." Krash, The Durham Rule and Judicial Administration of the Insanity Defense in the District of Columbia, 70 Yale L. J. 905, 941 (1961). A Committee on Mental Disorder as a Criminal Defense was established

by the Council on Law Enforcement in the District of Columbia to inquire into "the substantive and procedural law of the District of Columbia bearing on mental disorder as a defense in a criminal prosecution." S. Rep. No. 1170, 84th Cong., 1st Sess. 1 (1955); H. R. Rep. No. 892, 84th Cong., 1st Sess. 1 (1955). Among its recommendations was a mandatory commitment provision, subsequently enacted as § 24–301 (d). The Committee noted that while under the then existing discretionary commitment statute [9] it had been customary for the court and the appropriate executive official to order the confinement of all those who had been found not guilty solely by reason of insanity, more assurance should be given the public that those so acquitted would not be allowed to be at large until their recovery from past mental illness had been definitely established:

> "No recent cases have come to the attention of this Committee where a person acquitted in the District of Columbia of a crime on the sole ground of insanity has not been committed to a mental hospital for treatment. Nevertheless, the Committee is of the opinion that the public is entitled to know that, in every case where a person has committed a crime as a result of a mental disease or defect, such person *shall* be given a period of hospitalization and treatment to guard against imminent recurrence of some criminal act by that person." (Emphasis in the original.)

---

[9] The statute then in effect provided:
"If the jury shall find the accused to be then insane, or if an accused person shall be acquitted by the jury solely on the ground of insanity, the court *may* certify the fact to the Federal Security Administrator, who *may* order such person to be confined in the hospital for the insane, and said person and his estate shall be charged with the expense of his support in the said hospital." 59 Stat. 311. (Emphasis added.)

"The Committee believes that a mandatory commitment statute would add much to the public's peace of mind, and to the public safety, without impairing the rights of the accused. *Where accused has pleaded insanity as a defense to a crime,* and the jury has found that the defendant was, in fact, insane at the time the crime was committed, it is just and reasonable in the Committee's opinion that the insanity, once established, should be presumed to continue and that the accused should automatically be confined for treatment until it can be shown that he has recovered." S. Rep. No. 1170, 84th Cong., 1st Sess. 13 (1955); H. R. Rep. No. 892, 84th Cong., 1st Sess. 13 (1955). (Emphasis added.)

It is significant to note that in finding that mandatory commitment would not result in "impairing the rights of the accused" and that it was "just and reasonable . . . that the insanity, once established, should be presumed to continue . . . until it can be shown that . . . [the accused] has recovered," the Committee Report, which was embraced in the reports of the Senate and House committees on the bill, spoke entirely in terms of one who "has pleaded insanity as a defense to a crime." Certainly such confidence could hardly have been vouchsafed with respect to a defendant who, as in this case, had stoutly denied his mental incompetence at any time. And it is surely straining things to assume that any of the committees had in mind such cases as this, which are presumably rare.[10]

. Nor is it necessary to read § 24–301 (d) as an assurance that an accused who requires medical treatment will be

---

[10] We have been told of four such cases in the District of Columbia, two arising in the Municipal Court and two in the District Court: *District of Columbia* v. *Trembley,* D. C. 28343–60; *United States* v. *Taylor,* U. S. 4774–59; *United States* v. *Kloman,* Crim. No. 383–58; *United States* v. *Strickland,* Crim. No. 374–59.

hospitalized rather than be confined to jail. Simultaneously with the mandatory commitment provision, Congress enacted the present § 24–302, which permits transfers of mentally ill convicts from penal institutions to hospitals. Consequently, if an accused who pleads guilty is found to be in need of psychiatric assistance, he may be transferred to a hospital following sentence.

Finally, it is not necessary to accept the Government's literal reading of § 24–301 (d) in order to effectuate Congress' basic concern, in passing this legislation, of reassuring the public. Section 24–301 (a) provides a procedure for confining an accused who, though found competent to stand trial, is nonetheless committable as a person of unsound mind. That section permits the trial judge to act "prior to the imposition of sentence or prior to the expiration of any period of probation," if he has reason to believe that the accused "is of unsound mind *or* is mentally incompetent so as to be unable to understand the proceedings against him." (Emphasis added.) The statute provides for a preliminary examination by a hospital staff, and then "if the court shall find the accused to be then of unsound mind *or* mentally incompetent to stand trial, the court shall order the accused confined to a hospital for the mentally ill." [11] (Emphasis added.)

---

[11] D. C. Code § 24–301 (a) provides:

"(a) Whenever a person is arrested, indicted, charged by information, or is charged in the juvenile court of the District of Columbia, for or with an offense and, prior to the imposition of sentence or prior to the expiration of any period of probation, it shall appear to the court from the court's own observations, or from prima facie evidence submitted to the court, that the accused is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense, the court may order the accused committed to the District of Columbia General Hospital or other mental hospital designated by the court, for such reasonable period as the court may determine for examination and observation and for care and treatment if such is

This inquiry, therefore, is not limited to the accused's competence to stand trial; the judge may consider, as well, whether the accused is presently committable as a person of unsound mind.[12]  Since this inquiry may be undertaken at any time "prior to the imposition of sentence," it appears to be as available after the jury returns a verdict of not guilty by reason of insanity as before trial.

In light of the foregoing considerations we conclude that it was not Congress' purpose to make commitment compulsory when, as here, an accused disclaims reliance on a defense of mental irresponsibility.  This does not mean, of course, that a criminal defendant has an absolute right to have his guilty plea accepted by the court.  As provided in Rule 11, Fed. Rules Crim. Proc., and Rule 9, D. C. Munic. Ct. Crim. Rules, the trial judge may refuse to accept such a plea and enter a plea of not guilty on behalf of the accused.  We decide in this case only that if this is done and the defendant, despite his own assertions of sanity, is found not guilty by reason of insanity,

necessary by the psychiatric staff of said hospital. If, after such examination and observation, the superintendent of the hospital, in the case of a mental hospital, or the chief psychiatrist of the District of Columbia General Hospital, in the case of District of Columbia General Hospital, shall report that in his opinion the accused is of unsound mind or mentally incompetent, such report shall be sufficient to authorize the court to commit by order the accused to a hospital for the mentally ill unless the accused or the Government objects, in which event, the court, after hearing without a jury, shall make a judicial determination of the competency of the accused to stand trial. If the court shall find the accused to be then of unsound mind or mentally incompetent to stand trial, the court shall order the accused confined to a hospital for the mentally ill."

[12] Compare 18 U. S. C. § 4244, considered in *Greenwood* v. *United States,* 350 U. S. 366, which relates only to "mental incompetency after arrest and before trial." By the terms of 18 U. S. C. § 4246, commitment is to last only "until the accused shall be mentally competent to stand trial or until the pending charges against him are disposed of according to law."

§ 24–301 (d) does not apply. If commitment is then considered warranted, it must be accomplished either by resorting to § 24–301 (a) or by recourse to the civil commitment provisions in Title 21 of the D. C. Code.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE CLARK, dissenting.

Eighty-seven years ago, Chief Justice Waite in speaking of the function of this Court said: "Our province is to decide what the law is, not to declare what it should be . . . . If the law is wrong, it ought to be changed; but the power for that is not with us." *Minor* v. *Happersett*, 21 Wall. 162, 178 (1875). This holding followed as long a line of cases as it preceded. Today the Court seems to me to do what this long-established rule of statutory interpretation forbids. With sophisticated frankness it admits that the District's statute [1] "[b]y its plain terms . . . directs confinement in a mental hospital of any criminal defendant . . . who is 'acquitted solely on the ground' that his offense was committed while he was mentally irresponsible, and forecloses the trial judge from exercising any discretion in this regard." Despite these "plain terms" the Court writes into the statute an exception, *i. e.*, it applies "only to criminal defendants who have interposed a defense of insanity . . . ." It does

---

[1] § 24–301 (d), District of Columbia Code.

this despite the fact that the petitioner here apparently made no such contention in the trial court. Indeed, though he had counsel at the time of his trial in Municipal Court on two charges of passing bad checks, he made no attempt to appeal from the refusal of the court to accept his guilty plea and its finding that he was "not guilty on the ground that he was insane at the time of the commission of the offense." After being committed to St. Elizabeths Hospital for treatment for some six months, he filed this habeas corpus application. Today's action may have the effect of setting him free though he makes no claim that he was sane at the time of trial or is so at this time. In fact, the last doctor's report in the record shows him to be suffering from a manic depressive psychosis from which though he "appears to be in an early stage of recovery" it is "possible that he may have further lapses . . . ." It further states that it "would be advisable for him to have a period of further treatment in a psychiatric hospital." The order today risks bringing that to an end.

## I.

The case therefore presents the complex and challenging problem of criminal incompetency with which the people of the District of Columbia have for years been plagued. The Congress in 1955 adopted the present statute to meet what it called the "serious and dangerous imbalance . . . in favor of the accused and against the public" which was created in part by the rule in *Durham* v. *United States,* 94 U. S. App. D. C. 228, 214 F. 2d 862 (1954). S. Rep. No. 1170, 84th Cong., 1st Sess. 3 (1955). The statute, in my view, is not only designed to protect the public from the criminally incompetent but at the same time has the humanitarian purpose of affording hospitalization for those in need of treatment. It is, therefore, of the utmost importance to this community. More-

over, it has its counterpart in varying degrees in 36 of our States and in the federal system as well, many of which will be affected by this decision. In my view the Court undermines the purposes of these statutes; places a premium on pleas of guilty by defendants who were insane when they acted, made either *pro se* or through their attorneys; and thereby forces the conviction of innocent persons. And all of this is done in the face of the admitted "plain terms" of the mandate of Congress under the guise that the Court's holding "is more consistent with the general pattern of laws governing the confinement of the mentally ill in the District of Coumbia." I believe, however, that the Congress in adopting § 24–301 (d) said what it meant and that it meant what it said. I regret that the Court has seen fit to repeal the "plain terms" of this statute and write its own policy into the District's law. Especially do I deplore its suggestion of doubt as to its constitutionality. In the light of the cases this is chimerical. Finding myself with reference to the opinion like Mrs. Gummidge, "a lone, lorn creetur' and every think [about it] goes contrairy with me," I respectfully dissent.

## II.

It is well to point out first what is not involved here. First, this is not a civil commitment case, although this Court attempts to force one upon the parties. In providing the safeguards of D. C. Code § 21–310 as to the ordinary civil commitment of persons claimed to be insane the Congress clearly acted in protection of those who were not charged with criminal offenses or who had never exhibited any criminal proclivities. In protecting the public from the criminally incompetent it could with reason act with less caution. See *Overholser* v. *Leach,* 103 U. S. App. D. C. 289, 291, 257 F. 2d 667, 669, and *Kenstrip* v. *Cranor,* 39 Wash. 2d 403, 405, 235 P. 2d 467, 468. In criminal cases the person could be held in custody in any

event and humanitarian principles require his hospitalization where needed. Nor are the procedures for release involved here. Petitioner has not sought his release under the statute. The procedure, however, is simple and effective, *i. e.*, a doctor's certificate recommending release filed with the court is sufficient. If the doctor refuses such certificate, the inmate may seek to prove his sanity on habeas corpus. Here, however, no claim of sanity has been made.

Nor does this case involve commitment under D. C. Code § 24–301 (a). The first provision of that section largely has to do with cases before trial. The accused is entitled to a speedy trial. He may be acquitted. Hence his commitment to a hospital would delay the effectuation of these rights. The Congress, therefore, provided safeguards, *i. e.*, he might object to such a commitment and the consequent delay of his trial. But here—under § 24–301 (d)—the accused has already had his trial.

Finally, the fallacy in the Court's position is clearly apparent when in an attempt to justify its holding on practical grounds it says that an accused who pleads guilty and is sentenced may thereafter be transferred from the prison to a hospital and the assurances of hospitalization provided by § 24–301 (d) thus afforded. The short of this is that if the accused pleads guilty and is sentenced he then may suffer in addition to his conviction the same fate as petitioner suffers here. With due deference, this is a most cruel position. The accused, though innocent of the crime because of insanity, pleads guilty in hopes of a short jail sentence. He then has the stigma of criminal conviction permanently on his record. During or after sentence he is transferred to the hospital where he *may* be released at the end of his sentence but if found not cured at that time may still be subject to further custody and treatment. D. C. Code, § 24–302; 18 U. S. C. § 4247.

## III.

It has long been generally acknowledged that justice does not permit punishing persons with certain mental disorders for committing acts offending against the public peace and order. But insane offenders are no less a menace to society for being held irresponsible, and reluctance to impose blame on such individuals does not require their release. The community has an interest in protecting the public from antisocial acts whether committed by sane or by insane persons. We have long recognized that persons who because of mental illness are dangerous to themselves or to others may be restrained against their will in the interest of public safety and to seek their rehabilitation, even if they have done nothing proscribed by the criminal law. The insane who have committed acts otherwise criminal are a still greater object of concern, as they have demonstrated their risk to society. In an attempt to deal with these problems, Congress has enacted § 24–301 (d), which requires the court to order a person who has been acquitted of a criminal offense solely on the ground that he was insane at the time of its commission, to be confined in a hospital for the mentally ill.

Commitment to an institution of persons acquitted of crime because of insanity is no novelty. At common law, before 1800, the trial judge had power to order detention in prison of an acquitted defendant he considered dangerous because of insanity.[2] Hadfield, acquitted of

---

[2] Williams, Criminal Law: The General Part (2d ed. 1961), 456; Note, Releasing Criminal Defendants Acquitted and Committed Because of Insanity: The Need for Balanced Administration, 68 Yale L. J. 293 (1958); Weihofen & Overholser, Commitment of the Mentally Ill, 24 Tex. L. Rev. 307, 328. It has been said that in most cases, nevertheless, the defendant was released. Glueck, Mental Disorder and the Criminal Law (1925), 392–393.

attempted regicide in 1800 as insane, was remanded to an English prison because his future confinement was "absolutely necessary for the safety of society," 27 How. St. Tr. 1281, 1354. Parliament responded by providing for automatic commitment to a mental institution rather than prison in felony cases in which the accused was acquitted on grounds of insanity, 39 & 40 Geo. III, c. 94, and mandatory commitment has been the rule in misdemeanor cases as well in England since 1883. 46 & 47 Vict., c. 38. An accused acquitted on insanity grounds in Massachusetts was remanded to the sheriff for continued custody as early as 1810, *Commonwealth* v. *Meriam*, 7 Mass. 168, and in the District of Columbia, the judge being convinced that "it would be extremely dangerous to permit him to be at large," in 1835, *United States* v. *Lawrence*, 26 Fed. Cas. No. 15,577. The District of Columbia Code of 1901, 31 Stat. 1189, 1340, authorized the trial judge, in his discretion and without further hearing, to forward the defendant's name to an administrator, who, in his discretion, again without hearing, might order commitment. Most defendants acquitted on insanity grounds were committed under this rule.[3] At the present time statutes provide for mandatory commitment of persons acquitted by reason of insanity in 12 States and the Virgin Islands as well as in England and the District of Columbia.[4] Six States per-

[3] See Krash, The Durham Rule and Judicial Administration of the Insanity Defense in the District of Columbia, 70 Yale L. J. 905, 941 (1961); S. Rep. No. 1170, 84th Cong., 1st Sess. 12 (1955).

[4] Colo. Rev. Stat., 1957 Supp., § 39-8-4; D. C. Code, 1961, § 24-301; Ga. Code Ann., 1953, § 27-1503; Kan. Gen. Stat. Ann., 1949, § 62-1532; Me. Laws 1961, c. 310; Mass. Gen. Laws Ann., 1957, c. 123, § 101 (murder and manslaughter only; in other cases, c. 278, § 13, the trial judge may commit if satisfied the defendant is insane); Mich. Stat. Ann., 1954, § 28.933 (3) (murder only; in other felony cases, 1961 Supp., § 28.967, the trial judge shall commit if, after hearing, he determines continuing insanity); Minn. Stat. Ann., 1961

726

mit commitment in the discretion of the trial judge.[5]
Eighteen more provide for mandatory or discretionary
commitment if the trial judge finds that the defendant's
insanity continues [6] or that his discharge would be dan-
gerous to the public peace.[7]   In 10 States and in Puerto

Supp., § 631.19; Neb. Rev. Stat., 1956, § 29–2203; Nev. Rev. Stat.,
1961, § 175.445; N. Y. Code of Crim. Proc., § 454, as amended by
Laws 1960, c. 550; Ohio Rev. Code Ann., 1954, § 2945.39; V. I.
Code Ann., 1957, Tit. 5, § 3637; Wis. Stat. Ann., 1958, § 957.11
("rehearing" of present sanity and danger on request, see § 51.11).

[5] Ark. Stat. Ann., 1961 Supp., § 59–242 ("shall be committed . . .
upon probable cause"); Conn. Gen. Stat., 1961 Supp., § 54–37; Del.
Code Ann., 1960 Supp., Tit. 11, § 4702 (on motion of Attorney
General); N. M. Stat. Ann., 1953, § 41–13–3; Purdon's Pa. Stat.
Ann., 1930, Tit. 19, § 1351; S. C. Code, 1952, § 32–927 (on acquittal
or "question" of insanity at time of act).

[6] *Mandatory:* Ala. Code, 1958 recompilation, Tit. 15, § 429; Burns'
Ind. Stat. Ann., 1961 Supp., § 9–1704a (or if recurrence "highly prob-
able"); Utah Code Ann., 1953, § 77–24–15; as well as Michigan in
felony cases other than murder, see note 4, *supra.*   In Hawaii, Rev.
Laws, 1960 Supp., § 258–38, the burden is on the defendant to show
recovery.   In California, insanity is tried after it has been determined
whether defendant committed the act.   On a verdict of acquittal
because of insanity, the defendant is committed "unless it shall appear
to the court" that he has recovered, in which case he is held until
determined sane by civil procedures.   Cal. Penal Code, 1956, § 1026.

*Discretionary:* Ky. Crim. Code, 1960, § 268 (after hearing); W. Va.
Code Ann., 1961, § 6198 (on report of two appointed experts); as
well as Massachusetts in cases other than murder, see note 4, *supra.*

[7] *Mandatory:* Alaska Comp. Laws Ann., 1949, § 66–13–78; Ore.
Rev. Stat., 1961, § 136.730.

*Discretionary:* Fla. Stat., 1961, § 919.11 (must confine or remand
to friends' care); Iowa Code Ann., 1950, § 785.18; N. H. Rev. Stat.
Ann., 1961 Supp., § 607:3; N. C. Gen. Stat., 1958, § 122–84 (after
hearing, shall commit if found dangerous because of mental condition,
and if "his confinement for care, treatment, and security demands
it"); N. D. Century Code, 1960, § 12–05–03; R. I. Gen. Laws, 1956,
§ 26–4–7 (Governor may commit on judge's certification); S. D.
Code, 1960 Supp., § 34.3672; Vt. Stat. Ann., 1958, Tit. 13, § 4805;
Va. Code, 1960 replacement, § 19.1–239.

Rico, mandatory commitment follows a like finding by the trial jury [8] or by a second jury.[9] In three States standards for civil commitment must be met.[10] Only Tennessee makes no provision for such cases.[11] Many of these laws providing for commitment of acquitted defendants are by no means new, see the tabulation in Glueck, Mental Disorder and the Criminal Law, 394–399 (1925), and with very few exceptions such laws have been upheld by state courts against constitutional attacks.[12] The

[8] Ill. Rev. Stat., 1961, c. 38, § 592 (not entirely and permanently recovered); Md. Code Ann., 1957, Art. 59, § 8 (still insane); Miss. Code Ann., 1956 recompilation, § 2575 (still insane and dangerous); Mo. Stat. Ann., Vernon 1961 Supp., § 546.510 (not entirely and permanently recovered); N. J. Stat. Ann., 1953, § 2A:163–3 (still insane); Okla. Stat. Ann., 1958, c. 22, § 1161 (dangerous to discharge); Vernon's Tex. Code Crim. Proc. Ann., 1961 Supp., Art. 932b, § 1 (still insane); Wash. Rev. Code, 1951, § 10.76.040 (still insane or danger of recurrence).

[9] Idaho Code, 1948, § 19–2320 (still insane); Mont. Rev. Code Ann., 1947, § 94–7420 (same); Puerto Rico Laws Ann., 1956, Tit. 34, § 823 (same). In all three jurisdictions the trial judge has discretion whether or not to call the second jury.

[10] In Arizona, Rules of Crim. Proc., 1956, Rule 288, and in Wyoming, Stat., 1957, § 7–242, a civil commitment petition is required to be filed. In Louisiana, Rev. Stat., 1950, § 28:59, the acquitted defendant may be committed by the trial court "in the manner provided" for civil commitment in § 28:53. Presumably this requires compliance with the substantive standards as well as the procedures of civil commitment.

[11] Apparently in Tennessee there is likewise no common-law power to confine the acquitted insane. See *Dove* v. *State,* 50 Tenn. 348, 373 (dictum). But there appears to be no obstacle to instituting civil proceedings under Tenn. Code Ann., 1961 Supp., § 33–502, and 1955 ed., § 33–512.

[12] *In re Slayback,* 209 Cal. 480, 288 P. 769; *Bailey* v. *State,* 210 Ga. 52, 77 S. E. 2d 511; *In re Clark,* 86 Kan. 539, 121 P. 492; *In re Beebe,* 92 Kan. 1026, 142 P. 269; *Hodison* v. *Rogers,* 137 Kan. 950, 22 P. 2d 491; *State* v. *Burris,* 169 La. 520, 125 So. 580; *People* v. *Dubina,* 304 Mich. 363, 8 N. W. 2d 99; *People ex rel. Peabody* v. *Chanler,* 133 App. Div. 159, 117 N. Y. Supp. 322; *In re Brown,* 39

Model Penal Code of the American Law Institute contains a provision for mandatory commitment. ALI Model Penal Code, Proposed Final Draft No. 1, § 4.08. See also comments on this section in *id.*, Tentative Draft No. 4, p. 199. In practice, it has been said despite the varying provisions in the several jurisdictions that acquitted defendants are "nearly always" committed. Note, 68 Yale L. J. 293.

## IV.

The Court does not deny that petitioner was tried for an offense and acquitted solely on the ground of insanity at the time of its commission. It argues, however, that the procedure of § 24–301 (d), as applied to a criminal defendant who has not pleaded insanity, is inconsistent with the whole scheme of procedural safeguards provided for commitment of other individuals to mental hospitals in the District of Columbia and therefore could not have been intended by Congress. But the procedure of § 24–301 (d) applies only to defendants found not guilty solely on the ground of insanity. That is, unlike defendants committed before or during the trial, see *State ex rel. Smilack* v. *Bushong,* 159 Ohio St. 259, 111 N. E. 2d 918, all persons committed under § 24–301 (d) either have been found after trial to have committed the act itself, or, as here, have conceded that they committed it. It is this

Wash. 160, 81 P. 522; *State* v. *Saffron,* 146 Wash. 202, 262 P. 970; see also *Gleason* v. *West Boylston,* 136 Mass. 489; *Yankulov* v. *Bushong,* 80 Ohio App. 497, 77 N. E. 2d 88. Similar procedures were struck down in *Brown* v. *Urquhart,* 139 F. 846 (C. C. W. D. Wash.); *In re Boyett,* 136 N. C. 415, 48 S. E. 789; and *Underwood* v. *People,* 32 Mich. 1. *Brown* v. *Urquhart* required a hearing on present sanity as a matter of statutory construction and was overturned by the state court in *In re Brown, supra. Boyett* and *Underwood* relied in part on the abolition of habeas corpus, not present here, and the Michigan court has since allowed a commitment statute with more adequate release provisions to stand, *People* v. *Dubina, supra.*

adjudication, or this admission, that serves to explain and, in Congress' opinion, to justify different treatment for such individuals. *Overholser* v. *Leach,* 103 U. S. App. D. C. 289, 257 F. 2d 667. Whether we would have drawn this distinction is not the question; it suffices that the distinction was drawn and is not so untenable that we can say Congress could not reasonably have drawn it. And, insofar as § 24–301 (a) applies also to those who have been tried and found guilty, it is no more inconsistent with mandatory commitment where the defendant has not pleaded insanity than where he has done so. In either case Congress wanted commitment if the judge found the accused insane or if the jury entertained a reasonable doubt.

## V.

I agree with the Court that the present § 24–301 (d) was the response of Congress to the decision in *Durham* v. *United States, supra.* That decision substituted for the *McNaghten* rule the simple question whether the "unlawful act was the product of mental disease or mental defect." 94 U. S. App. D. C., at 240–241, 214 F. 2d, at 874–875. In amending the then § 24–301 (d), Congress sought "to protect the public against the immediate unconditional release of accused persons who have been found not responsible for a crime solely by reason of insanity. . . ." H. R. Rep. No. 892, 84th Cong., 1st Sess. 3, 13 (1955); S. Rep. No. 1170, 84th Cong., 1st Sess. 3; 101 Cong. Rec. 9258, 12229. This danger of improvident release, so crucial in the eyes of the Congress, has in fact inhibited the adoption of the *Durham* rule by other courts in jurisdictions where no mandatory commitment statute is available. *Sauer* v. *United States,* 241 F. 2d 640 (C. A. 9th Cir.); *United States* v. *Smith,* 5 U. S. C. M. A. 314, 329, 17 C. M. R. 314, 329; *United States* v. *Currens,* 290 F.

2d 751, 776–777, dissenting opinion; Sobeloff, Insanity and the Criminal Law: From McNaghten to Durham, and Beyond, 41 A. B. A. J. 793, 879 (1955).

This is not to say, however, that the sole purpose of § 24–301 (d) is commitment as a protection to the public. The policy of the law also includes assurance of rehabilitation for those so committed. *Ragsdale* v. *Overholser*, 108 U. S. App. D. C. 308, 312, 281 F. 2d 943, 947. The common law permitted an acquitted incompetent to be confined in the District of Columbia even before 1901. *United States* v. *Lawrence, supra*. The desire of the Congress to satisfy its interest in the rehabilitation of an incompetent defendant brought on the original statute authorizing 'commitment to a mental institution. The 1955 amendment, here under attack, was designed only to strengthen the safeguards to the public safety in the light of the intervening *Durham* rule. There can be no question that the interest of a free society is better served by commitment to hospitals than by imprisonment of the criminally incompetent. While, as the Court points out, transfer after confinement permits treatment during sentence, it is not mandatory, and it may be interrupted before completion and the patient set free. Almost every newspaper reports depredations of the criminally insane who unfortunately for themselves and the safety of others have been released on the public. It was the purpose of the statute to prevent this occurrence whether or not the accused pleads not guilty because of insanity. A defendant's plea neither proves nor affects his guilt or his sanity. To make the commitment procedure effective only on the defendant's option limits the statute's protection of the public, forces an unfortunate choice on attorneys appointed to represent defendants, convicts those who are innocent by reason of insanity and deprives them of the treatment afforded by a humanitarian public policy. See *Ragsdale* v. *Overholser*, 108 U. S. App. D. C. 308, 281

F. 2d 943. The Court says that this can all be done through another trial under civil commitment procedures, but this is but to disagree with the policy of Congress rather than the Court of Appeals which has upheld the statute. As mentioned, *supra,* the civil procedures are entirely insufficient where criminal acts are involved. The criterion of § 24–301 (d)—merely whether there is a reasonable doubt that the accused was capable in law of committing the offense—is a far cry from the test of civil commitment, where it must be proven to the satisfaction of the court that the accused is actually insane. The requirement that the petitioner here go free unless civil commitment proceedings be filed and he be adjudged insane creates a serious risk that petitioner will again be turned loose on an unsuspecting public to carry on his check-writing proclivities and perhaps much worse. His is but one example that will inevitably follow in the wake of this decision today.

## VI.

The Court disclaims the intention of granting petitioner an absolute right to plead guilty. Such a right would be *contra* to our concept of the fair administration of justice as exemplified in Rule 9 of the Criminal Rules of the Municipal Court of the District of Columbia, which was lifted *verbatim* from Rule 11 of the Federal Rules of Criminal Procedure.[13]  It provides ex-

---

[13] Rule 9 of the Criminal Rules of the Municipal Court of the District of Columbia reads:

"A defendant may plead not guilty, guilty or, with the consent of the Court *nolo contendere.* The Court may refuse to accept a plea of guilty, and shall not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge. If a defendant refuses to plead or if the Court refuses to accept a plea of guilty, or if a defendant corporation fails to appear, the Court shall enter a plea of not guilty."

plicitly that "[t]he Court may refuse to accept a plea of guilty." And it further prohibits the acceptance of a guilty plea without the court's "first determining that the plea is made voluntarily with understanding of the nature of the charge." The opinion today acknowledges that the trial judge need not accept the plea of guilty when, as here, he has in his hands a certificate from competent doctors that the petitioner was and remains insane and in need of treatment. The Court emphasizes again and again that the petitioner never at any time during his trial on the check charges suggested that "he is, or ever was, mentally irresponsible." Of course he did not; he preferred to go to jail for a short period. But the right of a court to refuse a plea of guilty is based on the principle that in a free society it is as important that the court make certain that the innocent go free as it is that the guilty be punished. This the court did here and decided that a just disposition of the case would not permit the entry of the plea of guilty. That the evidence of insanity was sufficient is not questioned. As this Court has often held, the judge "is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct . . . ." *Quercia* v. *United States,* 289 U. S. 466, 469 (1933); *Glasser* v. *United States,* 315 U. S. 60, 82 (1942). In the words of the late and revered Learned Hand, "he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." *United States* v. *Marzano,* 149 F. 2d 923, 925. And here in the District of Columbia its court of last resort, the Court of Appeals, has held that the trial judge is required to set aside jury findings of sanity where the record shows a reasonable doubt. *Isaac* v. *United States,* 109 U. S. App. D. C. 34, 284 F. 2d 168. This is only further indication of his duty to seek a just disposition of every case, which justified, if it did not require, the rejection of the guilty plea here.

It was also unquestionably proper for the prosecutor to introduce testimony of insanity. His function, this Court said in *Berger* v. *United States,* 295 U. S. 78, 88, is to act as "the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."

The Court denies none of this. Yet, although it stresses that the purpose of § 24–301 (d) was to protect the public from the release of dangerous persons acquitted as insane, and although it concedes that a defendant may be acquitted as insane without pleading insanity, the Court requires a finding of present insanity in order to commit in such a case. To me neither the words nor the policy of the law supports this; I cannot believe Congress thought only people who claim to be crazy are dangerous enough to be confined without further findings.

## VII.

The Court did not reach the constitutional issue. Its failure so to do is, I believe, a "disingenuous evasion," to borrow a phrase from Mr. Justice Cardozo in *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933). The Court should not, as I have said, rewrite a statute merely to escape upholding it against easily parried constitutional objections. I would uphold the statute. I shall not go into details, however, since the Court does not deal with the issue. In short, petitioner has no constitutional right to choose jail confinement instead of hospitalization. It is said that automatic hospitalization without a finding of present insanity renders the statute invalid but, as I see it, Congress may reasonably prefer the safety of compulsory hospitalization subject to the release procedures

offered by the statute and through habeas corpus. It is said that these release procedures are too strict, placing the burden on the petitioner. But it appears reasonable once a jury or a judge has found a reasonable doubt as to the sanity of a man who has admittedly passed bad checks to require a doctor's certificate to authorize release, and failing such to require proof of the doctor's error in refusing to issue it. There is no reason to believe that the doctors or, for that matter, the judge would be improperly motivated. Release is by no means illusory. In the past six years over 25% of those committed have been released. It must be remembered that here the constitutionality of § 24–301 (d) is at issue, not the wisdom of its enactment. That is for Congress. So long as its choice meets due process standards it cannot be overturned. The problem which faced Congress was the reconciliation of the opportunity for release of the accused through a judicial hearing with the vital public interest, deference to the views of institutional authorities and a decent regard for the hospitalization and cure of the accused. The balance struck by Congress, in my view, meets the essential requirements of due process.

In any event, petitioner does not claim that he is now sane. He has made no effort to secure his release on the ground of being cured. Surely he should be required to make such an effort before asking the Court to strike down the statute on that ground. Moreover, if the burden is too heavy, rather than opening the hospital doors to all persons committed under the statute, it would be more fitting to rewrite the release procedures by shifting the burden to the hospital authorities to prove the necessity for further hospitalization. The Court has not hesitated to use a similar device in another area. *Coppedge* v. *United States,* 369 U. S. 438. I would also think the Court would prefer to do this rather than create a loophole for those who seek to plead guilty. In so doing, the

Court would not force the badge of criminal conviction on innocent persons but would afford them the benefit of treatment, safeguarded by entirely fair and reasonable release procedures, and at the same time afford the public protection from those unfortunates among us that know not what they do. The Court has chosen not to reverse the burden of proof; perhaps the Congress will consider doing so.

I dissent.