**William James BRESNAHAN, Jr., Petitioner,**

v.

**Wayne K. PATTERSON, Warden, Respondent.**

**Civ. A. No. C-3671.**

United States District Court, D. Colorado.

Jan. 8, 1973.

of his mother and father on August 3, 1964, and he was sentenced to two concurrent life sentences. By petition for a writ of habeas corpus, filed by his guardian ad litem, he seeks release from confinement in the Colorado State Penitentiary. He asserts that his pleas were constitutionally infirm because:

(a) The pleas were involuntary in that they rested on improper persuasion on the part of his maternal grandparents and his attorney.

(b) His attorney had a conflict of interest because he was being paid by the maternal grandparents.

(c) His attorney failed to pursue a valid defense [not guilty by reason of insanity] and his attorney misadvised petitioner as to the consequences of the guilty pleas.

(d) The trial judge should have held a competency hearing on his own motion.

(e) The guilty pleas were not intelligently entered.

Before discussing petitioner's contentions, we summarize the long history of the case subsequent to imposition of the sentences. In an interpleader action concerning life insurance proceeds, Edward L. Wood was appointed guardian ad litem, and he commenced post conviction proceedings in the state courts advancing essentially the same contentions there that he makes here. The case first went to the Colorado Supreme Court in Bresnahan v. Luby (1966) 160 Colo. 455, 418 P.2d 171. It was there held that the trial judge did not have to disqualify himself because of Bresnahan's claim that he was going to call Judge Luby as a witness. The next report of the case is Bresnahan v. District Court (1967) 164 Colo. 263, 434 P.2d 419, in which Judge Luby was ordered to make available to Bresnahan's counsel, "all documents, letters and reports which were before him as of the time he permitted Bresnahan to plead guilty to murder of the first degree." Following this order, a hearing was held before Judge

Edward L. Wood, Donald P. MacDonald, John L. Kane, Jr., Dale Tooley, Denver, Colo., for petitioner.

Duke W. Dunbar, Atty. Gen., John P. Moore, Atty. Gen., Richard G. McManus, Jr., and David A. Sorenson, Asst. Attys. Gen., Denver, Colo., for respondent.

## MEMORANDUM OPINION

WINNER, Judge.

On January 5, 1965, when 16 years old, Bresnahan pleaded guilty to the murder

Luby on September 17, 1968, and he took the matter under advisement. The judge retired without deciding the case, and Harold A. Grant, who had been district attorney at the time of Bresnahan's guilty pleas was appointed to replace Judge Luby. Judge Grant disqualified himself, and Judge Shannon was appointed to decide the case based on the reporter's transcript of the hearings before Judge Luby. He ruled against Bresnahan on November 7, 1969, and in doing so, he made full findings of fact supporting his conclusions that Bresnahan was not entitled to relief. Once more the case went to the Colorado Supreme Court, and in Bresnahan v. People (1971) Colo., 487 P.2d 551, Judge Shannon's decision was affirmed in a full opinion by the Colorado Court. It was there held:

1. In a Colorado Rule 35(b) proceeding [which is similar to a proceeding under 28 U.S.C. § 2255] Petitioner has the burden of proof, and the state is under no duty to present any evidence if it believes that petitioner has failed to meet that burden.

2. Although a trial court should act with great caution in accepting a guilty plea from a 16-year old, such a defendant is competent, and the record shows "that the trial judge carefully and properly handled this phase of the proceedings. The trial judge fully complied with the requirements of McCarthy v. United States, 394 U.S. 459, 89 S. Ct. 1166, 22 L.Ed.2d 418."

3. The trial judge committed defendant for psychiatric observation, and the reports he received showed that the defendant was sane although emotionally disturbed. The information available to the trial judge showed that defendant was above average for a person of his years, and there was no reason for the trial judge to question Bresnahan's competency.

4. The pleas were voluntary and intelligent under the tests of Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747. The Colorado Court's opinion details much of the evidence on which this conclusion is based, and we do not repeat it here.

5. The fact that defendant's grandparents employed his attorney didn't result in a conflict of interest, especially when defendant had full knowledge of the circumstances of the employment, and when he knew he could have court appointed counsel. "That the grandparents were not inherently adverse parties to defendant is clearly indicated by their concern for defendant's welfare as expressed by voluntarily assuming the burden of hiring counsel for him, by their frequent trips to visit defendant on which occasions they supplied him with items which he desired, and by their letters to him during the pendency of proceedings."

6. Counsel's advice as to sentence possibilities was not error, particularly when "he indicated with probable accuracy the paths which defendant might follow and the probable consequences."

7. Counsel's failure to pursue the insanity defense resulted from the desire of defendant. " . . . defendant was unhappy with counsel for entering that very plea originally. Defendant testified that one of his reasons for avoiding the insanity plea was the possibility that he might be successful and spend his life in a mental institution even though counsel had not foreclosed the possibility that defendant might be released in a few years."

Five months after the Colorado Supreme Court's decision in Bresnahan v. People, this case was filed, and four

days' testimony has been received.[1] The evidence fully supports and we agree with the findings of Judge Shannon as affirmed by the Supreme Court of Colorado, but we consider and make findings and conclusions as to petitioner's various positions in the course of this opinion.

Bresnahan was arrested shortly after the bodies of his parents were discovered. His maternal grandparents employed Williams to represent him. Williams had done some title work and estate work for members of the grandparents' family, but there was no long or close relationship between Williams and the grandparents. Over Bresnahan's initial objection, Williams entered pleas of not guilty by reason of insanity for him. In accordance with Colorado law, Bresnahan was sent for psychiatric evaluation. Three psychiatrists at the University of Colorado Medical Center examined him in late August and early September, 1964. Drs. Macdonald, Redman and Langsley, in separate reports, all reported that he was legally sane at the time of the commission of the offense and at the time of their examination, although comment was made that he had a character disorder and needed psychiatric treatment.[2] Comment was made that he was above average in intelligence, and this comment is fully supported by the Court's observation of petitioner and by his testimony at time of trial.

Williams met with Bresnahan at the jail in Leadville, Colorado, on several occasions, and on October 14, 1964, he wrote him a six page letter outlining the problems with which petitioner was faced. Among others, the letter discussed these points:

(1) "If you plead guilty, the sentence would be life imprisonment, with the strong probability that you would be paroled after serving ten years. As you know, you have been charged with two murders. This means two life imprisonment sentences would be imposed. The Judge can order these sentences to run either consecutively or concurrently. We have discussed the meaning of these terms, and you understand them. There is a good probability that the Judge will order the sentences to run concurrently, so that you could expect to be paroled after serving ten years. However, no guarantee can be made at present that the Judge will order the sentences to run concurrently. If you plead guilty, the chances for concurrent sentences being imposed are better than if you plead not guilty, force the state to trial, and are found guilty and sane."

(2) If found guilty and sane after trial, the sentences would probably be consecutive, and in such event it is probable that ten years of each sentence would have to be served before parole. "However, if you make good progress toward rehabilitation, it is *possible* that the parole board could in some manner not now known bring it about that you would be paroled not sooner than ten years but before twenty years."

(3) "If you go to trial on the not guilty by reason of insanity, and are found to be insane, you would be sentenced to a mental institution until you are pronounced cured. This sentence could result in your being hospitalized all the rest of your life. At present, the facilities of the hospital at Pueblo are overcrowded, and many people sentenced to Pueblo actually serve their time in the penitentiary at Canon City. The words 'mental institution' and 'hospital' should not be interpreted to mean that these are pleasant places. Pueblo is not a pleasant place."

(4) It is possible that should you originally be found insane, you would be

---

1. Hearings were held on August 30–31, October 11 and December 22, 1972. The trial interruptions were at petitioner's request to obtain the attendance of additional witnesses.

2. The formal reports [Exhibits 12, 13 and 14] are dated in January, 1965, but the results of the examinations were before the trial judge and counsel in September, 1964. [See, Exhibit D.]

found to be sane and that you would be released in a few years, but the chances for this are not very good.

(5) "Your grandfather and I have urged you very strongly to plead guilty, serve your sentence, and be paroled; but we do not want to insist that you do so. Until you went to the Colorado Psychopathic Hospital, you wanted to plead guilty and take your punishment, and were displeased with me that I had let you be sent to the hospital. Since returning from the hospital, however, you have indicated that you should go to trial on the plea of not guilty by reason of insanity." [The letter then comments on page two that Bresnahan had reported to Williams that Dr. Langsley had said that Bresnahan would be released after two or three years, and the letter mentions that Williams had written Dr. Langsley.] "If he writes back that he believes you would be released after two or three years, then you should go to trial on the insanity plea."

[The letter later comments that before it was typed, Dr. Langsley had replied to Williams' letter of inquiry and had emphatically denied making any such statement to Bresnahan.]

(6) The nature of confinement at Pueblo and Canon City are discussed, and Williams said, "Neither place will be pleasant, but neither will it be impossible to stand. My personal preference would be Canon City for ten years rather than Pueblo for maybe the rest of my life. You must make the decision for yourself."

[The type of trial under a guilty and not guilty and not guilty by reason of insanity pleas were discussed, as was the projected cost of a full trial. However, it is to be noted that on another occasion, Bresnahan was told that the state would have to provide an attorney for him if his grandparents did not want to incur the cost.]

Williams' letter has been summarized and quoted because petitioner now rests much of his case on that letter. That letter, however, has an interesting sidelight as is evidenced by a letter of October 15, 1964, to petitioner's grandfather, which enclosed a copy of Williams' letter to Bresnahan. The letter to the grandfather discloses that Williams and the grandfather were so concerned with the enormity of the problem that they had conferred with and had solicited the advice of Dean Edward C. King, Dean of the University of Colorado Law School, and, by happenstance, the 1964 president of the Colorado Bar Association. Williams' letter to the grandfather, says, inter alia, "Dean King told me that the Association would not act on the matter; that he and the gentlemen with whom he had discussed the matter were unanimous in their belief that Jim's decision on the insanity plea should be controlling; and that there seemed to be 'no alternative but to let the boy make his own decision.'" In his letter to the grandfather, Williams added:

"You should give consideration to our withdrawing from the case if Jim insists on going to trial on the insanity plea. If we do this, Judge Luby would appoint a competent attorney to represent Jim, and the State of Colorado would have to stand the cost of a proper defense."

Certainly it cannot be charged that Bresnahan was pressured for an immediate answer to Williams' letter of October 14, 1964, because he mulled his decision until after he received a letter from Williams dated November 3, 1964, in which Williams reminded Bresnahan that a court appearance was scheduled for November 24, 1964, and in which he said:

"You know that your grandfather and I believe that you should change this plea and that you should plead guilty. My letter of October 14 spelled out the reasons in detail, but you are the one to make the decision.

"I wish you would read my October 14 letter very carefully and then write me a letter telling me exactly what plea you propose to make."

On November 10, 1964, Bresnahan wrote Williams:

"In answer to your letter of the 3rd, I have decided to enter a plea of guilty at the time of the trial. My reasons for changing my mind so suddenly you would neither understand nor would you approve of them, but 'the end always fits the means' they say.

"Towards the end of September both you & Mr. Grant told me that my trial could be as early as the middle of November. The time is near at hand. I realize that my inability to decide what to plead has impaired the proceedings considerably, and also realize that you are doing the best you can under the circumstances. I appreciate this very much, but as you can probably imagine, it is a bit stifling here what with no one to talk to and all. I want you to concentrate on two things from here on out, (1) getting the trial over with as soon as possible (2) arranging for my sentence to be served, at least in part, at Buena Vista. Please try to dispence with this as quickly as possible as I would like to start serving my sentence as quickly as possible. Thank you."

On November 24, 1964, the not guilty plea was withdrawn and a guilty plea was entered in each case. Defendant was advised of his rights, and the court ascertained that the pleas were voluntary. That record reflects:

"THE COURT: I might ask, has there been anyone try to force you to withdraw your pleas and enter a plea such as you want to enter now?

"THE DEFENDANT: No sir.

"THE COURT: This is all of your own free will and accord?

"THE DEFENDANT: Yes, sir.

"THE COURT: There has been no duress or pressure of any kind brought upon you to do this?

"THE DEFENDANT: No, sir.

"THE COURT: And knowing the consequences of your plea, do you still desire to withdraw your former pleas and enter a plea of 'Guilty' to murder?

"THE DEFENDANT: Yes, sir."

Seemingly it was discovered that at the November 24, 1964, hearings the informations were not read to the defendant, and on January 5, 1965, the proceedings of November 24, 1964, were vacated, and pleas were again entered. Twice more, defendant was advised of his rights and voluntariness of the plea was ascertained in each case.

"THE COURT: I might ask you further, is this plea voluntarily made?

"THE DEFENDANT: Yes, sir.

"THE COURT: In other words, is it under duress that you are making this plea? You understand the meaning of duress?

"THE DEFENDANT: Yes, sir.

"THE COURT: And is it under duress that you are making this plea?

"THE DEFENDANT: No, sir.

"THE COURT: Is it because of some promise that was made to you by someone—it doesn't make any difference who it is, whether your attorney or somebody else—concerning the disposition of your case?

"THE DEFENDANT: No, sir.

"THE COURT: Or because of any other particular reason? Is there any reason at all that you know of why you are making this plea, other than upon your own voluntary desire to make a plea of guilty?

"THE DEFENDANT: No, sir."

Not only did petitioner write Williams on November 10, 1964, that he wanted to plead guilty for reasons Williams didn't understand, but, additionally, he testified at our trial that in fact he wasn't relying on Williams' advice, and he testified as to his reasons for pleading guilty:

"I can't say exactly what went on in my mind. The major facts—I had just been through a considerable emotional upheaval which resulted in the death of my parents. I had no one else to whom I could turn except my

grandparents. They were the last rock of solidarity in an ocean of despair, to put it metaphorically. I could not bring myself to cast off from this rock. I wasn't ready to venture out on my own, so to speak, and this was the major factor in my changing my plea. I still believed that an insanity defense would be successful, and I wished to pursue it, but not without my grandparents' support. . . . My grandparents gave me a great deal of moral support at that time and in showing consideration and kindness and loyalties after I had murdered their daughter, throughout this time and particularly before the trial. I had a very deep feeling for them and though I believed they were wrong in wanting me to change my plea, I could not go against their will if they had removed their support altogether. It wasn't so much the financial support that I was worried about, as I have said, it was the moral support—the emotional support. My grandparents, I believe, were and are totally ingenuous and I believe that they thought it would be to my best interests to plead guilty to the crimes. I cannot hold them blameworthy in any respect. I thought they were wrong at the time and I still do. We have discussed things. It still bothers them to some degree so I won't go into it any more, but I love them very much and I do think they were honest in feeling that I should plead guilty. Mr. Williams didn't give me that impression. I can't say exactly what he thought—it didn't come from the heart, so to speak, as it did from my grandparents. The thing of paramount impression in my mind was there was no one to turn—I could turn to except my grandparents, no one in the world who would help me. They had shown remarkable loyalty and love during this time when he told me they would remove their support from the case. I took it not so much to give financial support, as emotional support.

"It was the only thing that I paid any attention to. The only thing that I had as a reason for changing my plea. I did not wish to do it, but I couldn't bear to have my grandparents look upon me with the same scorn as I assumed the rest of the world was looking at me. I really don't think there is anything else I can say that would add importance to the case."

█ Thus, Bresnahan admitted under oath the murder of his mother, and he at no time claimed any lack of understanding of the proceedings, nor did he say that he relied on any advice given him by his attorney. He freely acknowledged that the advice given him by his grandparents was good faith advice given in what they thought were Bresnahan's best interests. Although eight years later he says that he thought "an insanity defense would be successful," at time of his pleas three qualified psychiatrists had reported that he was legally sane, and he surely did not hint in his letter of November 10, 1964, that he wanted to do anything other than plead guilty for reasons Williams "would neither understand nor would you approve them." From the record in the state court proceedings and from the record here, we find no undue or improper pressures applied to Bresnahan to induce him to plead guilty. We find that the pleas were knowledgeable and voluntary within the tests of Brady v. United States (1969) 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747; Machibroda v. United States (1962) 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473; Waley v. Johnston (1942) 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302; Walker v. Johnston (1941) 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830; Chambers v. Florida (1940) 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716; and Kercheval v. United States (1927) 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009.

Moreover, even if Bresnahan did rely on Williams' advice, most of his contentions in this regard are answered by Lattin v. Cox (1966) 10 Cir., 355 F.2d 397; United States v. Crank (1971) 9 Cir., 438 F.2d 635; Schnautz v. Beto

(1969) 5 Cir., 416 F.2d 214; and United States v. Jones (1968) 4 Cir., 392 F.2d 567. United States v. Antoine (1970) 2 Cir., 434 F.2d 930, is applicable to the grandparents' advice:

> "Before entering his plea, Antoine expressly denied that any threats or promises were made to induce him to plead guilty. Moreover, petitioner's allegations of advice and persuasion, not amounting to threats, by a person not an officer of the court could, even if proved, never establish the sort of compulsion that would invalidate a plea entered with full understanding of the consequences."

Petitioner relies most strongly on United States ex rel Codarre v. Gilligan (1966) 2 Cir., 363 F.2d 961. The case is inapposite. Codarre was 13 years old and he had a history of epilepsy and brain abnormalities. At time of trial, a psychiatrist was ready to testify that Codarre was legally insane. After the trial started, the trial judge conferred at night with the district attorney, defense counsel and four psychiatrists without the boy's knowledge, and this group's decision that he was to plead guilty was never explained to Codarre, nor was he given any opportunity to make a decision on his own. Additionally, he had nothing to gain from the guilty plea, while here Bresnahan could, and in fact did, gain concurrent sentences which he might or might not have received following two trials. All that *Codarre* really holds is that a defendant is entitled to make a reasoned choice in entering a guilty plea, and that an opportunity for such a choice was not given the defendant there. Williams' letter to Bresnahan set forth the choices available, and Bresnahan thought over the problems for almost a month before he replied in writing that he wanted to plead guilty. The facts of *Codarre* just do not fit this case.

Lynch v. Overholser (1962) 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211, illustrates problems which can arise if a defendant is denied the right to plead guilty and if, over defendant's objection, a finding of not guilty by reason of insanity is made. The case is not directly in point because it has to do with procedural problems under the District of Columbia code, but it does demonstrate that absent a judicial determination of incompetency, a defendant has a right to plead guilty if he wants to. Here, there was no such judicial determination, and, based on the psychiatric evaluations before the trial court and counsel, there was no reason to think that Bresnahan was legally insane at the time of the murders or that he was incompetent to assist in his trial. After long reflection, he decided that he wanted to plead guilty, and he was permitted to do so following a full advisement as to his rights. Faced with the three psychiatrists' reports, the risk of consecutive sentences, and Bresnahan's letter of November 10, 1964, Williams had no duty to force Bresnahan to trials on insanity pleas.

It would seem that with Bresnahan's testimony that he didn't rely on Williams' advice, it would not be necessary to delve into the adequacy of that advice, but, as compared to the posture of the case when it was before the Colorado Supreme Court, a new twist has been added. Now, petitioner's counsel say that although Bresnahan thinks that he didn't rely on his counsel's advice, he subconsciously did rely on and was motivated by it. A psychiatrist was called to so testify, but about the best he could come up with was testimony that in his opinion Bresnahan could have relied on Williams' advice without knowing it. This testimony, of course, was based on an examination eight years after the fact,[3] and it was based on file information and a quite brief examination of petitioner. This same psychiatrist said that in his hindsight opinion, Bresnahan murdered his parents as a result of an

---

3. Retrospective competency hearings are not per se inadequate. Barefield v. State of New Mexico (1970) 10 Cir., 434 F.2d 307.

irresistable impulse, but his opinions were badly shaken on cross-examination, and the Court finds the testimony to be unconvincing and unacceptable when compared with the testimony of the state's doctors and the reports of those doctors based upon their examination of defendant before trial.

Counsel's novel contention that a guilty plea should be set aside on a theory that a defendant pleaded guilty because of subconscious compulsions would render a trial judge's inquiry at time of entry of a plea an exercise in futility. There is no question and no procedure which could be devised which would protect against this post conviction attack unless every defendant desiring to plead guilty were given a full psychiatric evaluation, and even this wouldn't get the job done, because, just as here, a new psychiatrist would surface later. Crail v. United States (1970) 10 Cir., 430 F.2d 459, had to do with non-apparent physical injuries, but its reasoning is fully applicable to the asserted subconscious reliance on advice of counsel now said to be erroneous, and *Crail* answers the argument that the trial judge should have held a competency hearing when he already had the reports of three psychiatrists before him.

Nevertheless we do discuss briefly the advice under present attack. It is said that Williams gave incorrect advice as to probable length of confinement in the penitentiary and in the state hospital and that he gave erroneous advice as to eligibility for parole. It developed at time of trial that there is uncertainty as to the meaning of applicable Colorado statutes having to do with parole eligibility, but the Attorney General stated that the advice given is in accord with prevailing practice. The questions have not been definitely resolved by the Colorado courts, but it is to be noted that this same charge was made in Bresnahan v. People, *supra*, and in response the Colorado Supreme Court said that Williams "indicated with probable accuracy the paths which defendant might follow and the probable consequences." It seems fair to say that the advice given by Williams at least was probably correct.

■ However, as we all know, a lawyer is not a guarantor of the correctness of his advice. In McMann v. Richardson (1970) 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763, it was held:

"Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases."

Wellnitz v. Page (1970) 10 Cir., 420 F.2d 935, had to do with sentence estimates. It was held:

"Certainly, if an attorney recklessly promises his client that a specific sentence will follow upon a guilty plea, or otherwise unfairly holds out an assurance of leniency in exchange for a confession of guilt, the question may arise whether such assurances were coercive, or whether such representation may be deemed constitutionally ineffective. Brown v. Beto, 377 F.2d 950 (5th Cir. 1967). However, an attorney may offer his client a prediction, based upon his experience or instinct, of the sentence possibilities the accused should weigh in determining upon a plea. An erroneous sentence estimate by defense counsel does not render a plea involuntary. Bailey v. U. S., 312 F.2d 679 (10th Cir. 1963); United States ex rel Bullock v. Warden, 408 F.2d 1326 (2nd Cir. 1969); United States v. Horton, 334 F.2d 153 (2nd Cir. 1964). And a defendant's erroneous expectation, based on his attorney's erroneous estimate, likewise does not render a plea involuntary."

■ With the reluctance of the Colorado Supreme Court to express a firm

opinion as to the total accuracy of Williams' opinion as to Colorado law, and with that Court's statement that his opinion was "probably" correct, coupled with the Attorney General's statement that the opinion is in accordance with prevailing practice in Colorado, by no stretch of the imagination can it be said that the advice was "not within the range of competence demanded of attorneys in the criminal process." Brady v. United States (1969) 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747. The record establishes that Williams' advice was indeed competent, and it shows skill, diligence and concern on his part in his representation of Bresnahan. The record establishes that Williams is entitled to commendation rather than to condemnation for the services he performed for petitioner. The argument as to competency of counsel fails. Frand v. United States (1962) 10 Cir., 301 F.2d 102; Johnson v. United States (1967) 10 Cir., 380 F.2d 810; Wright v. Craven (1969) 9 Cir., 412 F.2d 915; and Melton v. Patterson (1970) D.C.Colo., 313 F.Supp. 1287, aff'd (1971) 445 F.2d 410, where it was said:

"No less than a showing of 'bad faith, sham, or farcical representation' will suffice to support a claim of inadequate representation."

■ Even if this were not so, Bresnahan says that he didn't rely on Williams' advice, and there must be a showing of cause and effect before any argument of adequacy of counsel can be upheld. In re Parker, (1970) 8 Cir., 423 F.2d 1021; Kienlen v. United States (1967) 10 Cir., 379 F.2d 20 and Berry v. Swenson (1971) D.C.Mo., 326 F.Supp. 1120.

■ Bresnahan's testimony destroys the argument that there was a conflict of interest. The alleged conflict faced by Williams was that he had earlier represented members of the grandparents' family in totally unrelated matters and that he was being paid by the grandparents. But, Bresnahan knew who was paying Williams, knew that he could have appointed counsel, wrote Williams on November 10, 1964, that "(I) realize that you are doing the best you can under the circumstances," and he testified eight years later that he thought his grandparents "were and are totally ingenuous and I believe that they thought it would be to my best interests to plead guilty to the crimes." The record in this case does not bring it within the principles of Whitaker v. Warden (1966) 4 Cir., 362 F.2d 838, relied upon by petitioner, because there it was clearly shown that counsel was in fact representing an 11-year old's aunt who employed him rather than the minor defendant himself. It was there shown that the aunt did not have the 11-year old's interests in mind, but here, the showing is to the exact contrary. There was no disqualifying conflict of interest here. Williams and the grandparents were all giving Bresnahan honest advice, and Bresnahan was fully informed as to who was paying Williams and as to his right to have appointed counsel. See, Fryar v. United States (1968) 10 Cir., 404 F.2d 1071; Goodson v. Peyton (1965) 4 Cir., 351 F.2d 905; United States v. LaVallee (1968) D.C.N.Y., 282 F.Supp. 968.

■ In conclusion, we hold:

(a) The guilty pleas entered by petitioner were knowledgeable and voluntary.

(b) There was no underlying improper persuasion by either petitioner's counsel or his grandparents leading up to the guilty pleas.

(c) The guilty pleas entered by petitioner resulted from careful study and reflection on his part, and the decision to enter those guilty pleas was his.

(d) Although only 16 years of age when the guilty pleas were entered, Bresnahan was fully competent to understand the nature of the proceedings and he was fully competent to make the decision he made.

(e) Petitioner's attorney at the time of entry of the guilty pleas had no disqualifying conflict of interest, and the advice he gave petitioner was honest, sincere advice motivated solely by a desire to further Bresnahan's best interests.

(f) Bresnahan's attorney furnished competent services to him, and the charge of professional incompetence is totally unsupported by the record.

(g) The trial judge was under no duty to order a competency hearing on his own motion, nor did he have any reason to suspect that Bresnahan was not legally sane at the time of the murders or at time of trial.

(h) Defense counsel did not fail to pursue an available defense when, (a) his client stated in writing and after long consideration that he wanted to withdraw the plea of not guilty by reason of insanity and enter a plea of guilty, (b) three psychiatrists had reported that Bresnahan was legally sane, (c) there was no substantial basis on which to found an insanity plea, and (d) there was real risk of consecutive sentences if Bresnahan went to trial and was convicted.[4]

(i.) During all of the proceedings, Bresnahan's state court counsel and his grandparents at all times advised Bresnahan solely from the standpoint of a consideration of what they believed his best interests to be.

One final comment should be made. Bresnahan's guardian ad litem and his counsel in this court have represented him ably and well, and they are to be commended for their effort to secure his release on this petition for a writ of habeas corpus, but, the petition is hereby denied.

4. In People v. Moya (1972) Colo., 504 P.2d 352, an eye witness and the investigating officer were not called. It was manifest that those witnesses could have given testimony favorable to Moya. The case is of no help to petitioner here where

Williams and the trial judge had no real reason to think that Bresnahan was incompetent and where three competent psychiatrists had reported that he was competent.