JOSEPH TITO STATCHUK *v.* WARDEN,
MARYLAND PENITENTIARY

[No. 870, September Term, 1982.]

*Decided February 8, 1983.*

The cause was argued before LISS, WILNER and WEANT, JJ.

*Gary W. Christopher, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Ann E. Singleton, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *H. Gary Bass, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

This proceeding arises under the Interstate Agreement on Detainers (I.A.D.) and presents some novel questions for our review.

The basic facts are not in substantial dispute. On February 1, 1979, an indictment was returned in the Superior Court of New Jersey for Atlantic County charging appellant with two counts of breaking and entering with intent to steal and one count of grand larceny. Appellant was eventually arraigned on that indictment and released on his own recognizance pending trial. He thereafter returned to Maryland, where he had been living and where he soon

became incarcerated as the result of certain other infractions.

At some point — the record is a bit confusing as to the date — the State of New Jersey filed a formal request under I.A.D. with the Maryland prison authorities for temporary custody of appellant in order to try him on the open 1979 indictment.[1] Appellant responded with a petition for writ of *habeas corpus,* filed in the Baltimore City Court, through which he sought to block his transfer to New Jersey. He claimed, and at the hearing held on the petition sought to prove, (1) that acting pursuant to Article III of I.A.D. (Md. Code Ann. art. 27, § 616D), he had previously requested a prompt disposition of the New Jersey charges, that New Jersey had failed to bring him to trial thereon within 180 days, as it was obliged to do, and that, as a result, it had lost its right to proceed against him on that indictment; (2) that he was not in New Jersey when the offenses were allegedly committed; and (3) that his health was too poor to permit the transfer.

The court regarded the petition and the hearing as governed by what the Supreme Court said and held in *Cuyler v. Adams,* 449 U.S. 433 (1981), and thus permitted appellant to raise only those defenses that would be cognizable in an action under the Uniform Criminal Extradition Act. It heard testimony from appellant as to his absence from New Jersey when the offenses were committed (and some evidence as to the current state of his health), but it refused to permit any evidence regarding his earlier attempt to invoke I.A.D. The continued viability of the New Jersey charges, said the court, was a matter for the New Jersey courts to determine. Finally, after some belated "flap" over the matter, the court determined that the formal request filed by New Jersey was valid and in compliance with the requirements of I.A.D.

---

1. The "Request For Temporary Custody," addressed to the Superintendents of the Maryland Reception, Diagnostic, and Classification Center and the Maryland Penitentiary, and purportedly signed by the New Jersey prosecutor and judge, is dated July 27, 1981. When the Request was actually filed is not clear. Appellant's first appearance in court pursuant to the New Jersey request was on February 23, 1982.

At the conclusion of the hearing, the court found that appellant was in fact the person sought by New Jersey and that he had failed to meet his burden of proving his absence from that State when the offenses were committed. It therefore entered an order denying the writ.

Appellant appeals from that order, claiming that:

> "I.  The court erred in ruling that Appellant lacked standing to challenge his return to New Jersey pursuant to Article IV of the interstate agreement on detainer's [*sic*] on the ground that the power of the New Jersey courts to try him had lapsed under the terms of the agreement.
>
> II.  The court erred in refusing to consider Appellant's proffer that the request for temporary custody had not been approved by the court having jurisdiction.
>
> III.  The court erred in refusing to consider Appellant's evidence of poor health."

The State, in addition to defending the court's rulings, has moved to dismiss the appeal as one not authorized by law. We think that the appeal *is* authorized, but we find no error. We therefore shall affirm.

### (1) *Authorization For The Appeal*

The State's argument proceeds thusly: (1) appeals to this Court may be taken only if authorized by statute; (2) this is an action by appellant to prevent his transfer to New Jersey under I.A.D.; (3) there is nothing in I.A.D. authorizing an appeal from an order denying such relief; (4) therefore, no right of appeal exists from such an order. We find no merit to that argument.

The State of New Jersey was acting pursuant to Article IV (a) of I.A.D. (*see* Md. Code Ann. art. 27, § 616E (a)) in seeking custody of appellant; and, although nothing in that article (or elsewhere in the statute) spells out either a

specific right on the part of an inmate to resist such a request in the custodial State or a procedure for asserting such a right in the courts of that State, subsection (d) of Article IV (§ 616E (d)) does provide that:

"Nothing contained in this Article IV shall be construed to deprive any prisoner of *any right* which he may have to contest the legality of his delivery as provided in subsection (a) hereof, but such delivery may not be opposed or denied on the ground that the executive authority of the sending state has not affirmatively consented to or ordered such delivery." (Emphasis supplied.)

In *Cuyler v. Adams, supra,* 449 U.S. 433, the Court considered this section of Article IV in terms of whether an inmate whose involuntary presence was sought under I.A.D. by another State had a right to a pre-transfer hearing in the custodial State. The statute is as silent on that question as it is on the question of whether an appeal will lie from an order directing the transfer.

The Court drew a careful distinction between Article III of I.A.D., which permits the *inmate* to invoke the Act and require his temporary transfer to another State that has lodged a detainer against him, and Article IV, which permits the *accusing State* to invoke the Act and secure the inmate's presence with or without his consent. In the former case, the inmate's request acts as a waiver of extradition, both to and from the accusing State. In the latter case, however, there is no such waiver; the interstate transfer is a nonvoluntary one from the inmate's point of view. In that situation, the Court looked at I.A.D. in conjunction with the Uniform Criminal Extradition Act (or its counterparts in States that have not adopted the Uniform Act). Absent I.A.D., a prisoner could be involuntarily transferred across State lines only in accordance with the procedures established in the extradition statutes.

The Court read Article IV (d) of I.A.D. in that context, as preserving to a prisoner being proceeded against under

Article IV all the rights accorded him had his involuntary transfer been sought *via* extradition. The Court stated, at pp. 449-50:

"In light of the purpose of the Detainer Agreement, as reflected in the structure of the Agreement, its language, and its legislative history, we conclude as a matter of federal law that prisoners transferred pursuant to the provisions of the Agreement are not required to forfeit *any* pre-existing rights they may have under state or federal law to challenge their transfer to the receiving State." (Emphasis supplied.) [2]

Thus, notwithstanding the silence of Article IV (d) on the matter, as inmate Adams would have been entitled to a pre-transfer hearing in the custodial State had the requesting State proceeded under the Extradition Act, he could not be denied such a hearing because the requesting State chose, alternatively, to proceed under I.A.D. *Compare Wilson v. State,* 44 Md.App. 318, 334-35 (1979), *cert. den.* 287 Md. 758 (1980), which, to the extent it reached a different conclusion, is obviously no longer valid.

*Cuyler* cannot, as the State urges, be limited to the question of pre-transfer hearing. The whole thrust of the Opinion is to the contrary; what is preserved to a prisoner under Article IV (d) is the full panoply of procedural rights that would be available to him under the State's extradition laws, other, of course, than the right to have the matter initially determined by the Governor. That is clear beyond cavil.

Maryland has adopted the Uniform Criminal Extradition Act; it appears as Md. Code Ann. art. 41, §§ 16, *et seq.* Section 25 of art. 41 permits a person arrested on a warrant

---

**2.** *See also* the passage appearing at p. 448 of 449 U.S., wherein the Court adopts the "suggestion" that "a prisoner transferred against his will under Art. IV should be entitled to whatever 'safeguards of the extradition process' he might otherwise have enjoyed. Those safeguards include the procedural protections of the Extradition Act (in those States that have adopted it), as well as any other procedural protections the sending State guarantees persons being extradited from within its borders."

of rendition to contest the legality of the arrest through a petition for *habeas corpus.* It then states that "[i]f the application for a writ of habeas corpus after an extradition hearing only, is denied by the trial court, the denial may be appealed to the Court of Special Appeals."

If, as a matter of Federal law, a prisoner is entitled by I.A.D. Article IV (d) to all of the "prodedural protections the sending State guarantees persons being extradited from within its borders" (*see* footnote 2, *ante*) and one of the rights accorded persons whose extradition is sought is to appeal the denial of his petition for *habeas corpus,* it follows that a prisoner whose custody is sought under I.A.D. Article IV has that same right of appeal. The statutory basis for the appeal is art. 41, § 25 which, through statutory construction, is necessarily read into art. 27, § 616E (d). The State's motion to dismiss is therefore without foundation and will be denied.

### (2) *Standing To Challenge Viability Of New Jersey Charges*

Although *Cuyler* reads into Article IV (d) a *procedure* for challenging, in the custodial State, an involuntary transfer under I.A.D., it does not expand the scope of the permitted challenge. The statute preserves to the prisoner "any right which he may have to contest the legality of his delivery" other than the lack of affirmative consent of the Governor, but it provides no new or additional grounds.

A *habeas corpus* proceeding under the extradition laws is a very limited one. As the Supreme Court held in *Michigan v. Doran,* 439 U.S. 282, 289 (1978):

> "A governor's grant of extradition is prima facie evidence that the constitutional and statutory requirements have been met. [Citation omitted.] Once the governor has granted extradition, a court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether

the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive. These are historic facts readily verifiable."

*See also Utt v. State,* 293 Md. 271, 285 (1982).

That is the extent of an arrestee's rights under the extradition laws, and that is all that is preserved under I.A.D. Article IV (d).

The documents filed by the requesting State under I.A.D. serve the same purpose and are entitled to the same presumptive validity as a Governor's warrant of rendition. They do no more than serve as a basis for commencing an agreed-upon process for the interstate rendition of the accused. The courts of the custodial State are in no better position in an I.A.D. case than they are in an extradition case to delve into the underlying validity of the charges or the requesting State's right to try the accused.

The Maryland court is not the proper forum in which to determine whether appellant effectively invoked Article III of the Act with respect to the charges at issue, or, if he did, whether good cause existed for New Jersey's failure to obtain custody of him and try him within the statutory period. These are matters that are best left to the courts of New Jersey. *Cf. Koprivich v. Warden,* 234 Md. 465, 468 (1964): "[I]t is generally held that the validity of an indictment, affidavit or other pleading is a matter for the demanding state, and not the asylum state, to determine." If, for any reason, the indictment filed against appellant has lost its validity, we are confident that the New Jersey courts will take the appropriate action, as the Maryland courts would do (and have done) in the reverse situation. *See Hoss v. State,* 266 Md. 136 (1972); and *cf. Dennett v. State,* 19 Md.App. 376 (1973), *cert. den.* 271 Md. 734 (1974).

For these reasons, we find no error in the court's refusal to consider appellant's attack on the continued validity of the New Jersey indictment, or the evidence offered by him in support of that attack. Neither was relevant to the proceeding.

### (3) *Validity Of New Jersey's Request*

This proceeding was apparently the first of its kind in Maryland since the *Cuyler* decision. Before *Cuyler,* a request under I.A.D. Article IV was handled administratively; the inmate was transferred without benefit of a judicial hearing. *See* Maryland Extradition Manual, published (apparently) by the Attorney General's Office. *Cuyler,* of course, by providing the right to a hearing, also necessitated the development of some procedures for the conduct of the hearing.

Giving *Cuyler* a careful reading, the State determined that an I.A.D. hearing should be essentially the same as one conducted under the extradition laws, except that in lieu of the Governor's warrant of rendition, the documents filed by the requesting State should be placed into evidence in order to establish the basis for the transfer.

That is what the State did below. It offered the original "Request For Temporary Custody" addressed to the Maryland penal authorities and signed by one Solomon Forman, First Assistant Prosecutor, Atlantic City, New Jersey. The "Request" identified the charges and the indictment pending against appellant in New Jersey. Under Mr. Forman's signature was a certificate that Mr. Forman "is an appropriate officer within the meaning of Article IV (a) and that the facts recited in this request for temporary custody are correct. . . ." The signature under this certificate is illegible, but on the form the signatory is identified as a judge of the Superior Court of New Jersey, Atlantic County.

Counsel for appellant objected to the document on the grounds that (1) it was not "authenticated" with the New Jersey State seal and (2) it was not signed by a judge of Atlantic County. He proffered:

> "I know all the judges in Atlantic County. I maintained an office there for six years. We have no judge up there by any such name. And every judge of the Superior Court, under New Jersey law, must put after his name J.S.C. It means Judge of Supe-

rior Court. I noticed the required signature is conspicuously absent from [the] document."

The court overruled the objection and admitted the document,[3] and we find no error.

The Request filed by New Jersey was in precisely the form required by I.A.D. Article IV (a) and approved by the States (including Maryland) that have adopted the Act. *See* Maryland Extradition Manual, *supra,* pp. 39 and 67. Nothing in the statute requires that the request be sealed or authenticated. Article IV (a) requires only that it be in writing and that "the court having jurisdiction of [the indictment] shall have duly approved, recorded and transmitted the request. . . ."

Appellant offered no *evidence* that the Request was not what it purported to be, that it had not been "approved, recorded and transmitted" by the Superior Court of New Jersey. That counsel had at some unspecified period in the past practiced law in Atlantic City, New Jersey, and was unfamiliar with the judge who purportedly signed the Request (assuming he could make out the name of the judge) is not sufficient to establish that no such judge exists. Indeed, it is not even proper evidence that no such judge exists. The same is true with respect to the alleged practice of adding the initials "J.S.C." after a judge's signature. The Request was valid on its face, and appellant had the burden of showing, *by competent evidence,* that it was improperly issued. *See Ray and Huntley v. Warden,* 13 Md.App. 61 (1971).

---

3. The court responded to counsel's proffer by accusing him of charging the State's Attorney with presenting a forged document and suggesting that counsel may have violated the Code of Professional Responsibility. We think that the court may have overreacted to counsel's comments, although it is true (and all counsel should keep firmly in mind) that the appropriate way to bring factual matters in dispute to the court's attention is through sworn testimony or other admissible evidence and not through argument as to admissibility. *See* Code of Professional Responsibility, EC 7-24.

### (4) *Evidence Of Appellant's Poor Health*

An inmate's poor health or fear for his safety is not a basis for denying extradition. *Sheriff v. Randono,* 515 P.2d 1267 (Nev. 1973), *cert. den.* 416 U.S. 956 (1974); *Lomax v. Cronin,* 575 P.2d 1285 (Colo. 1978); *State v. Devine,* 342 So.2d 103 (Fla.App. 1977); *Commonwealth ex rel. Heaton v. Harvey,* 164 A.2d 123 (Pa.Super. 1960); *Grano v. State,* 257 A.2d 768 (Del.Super. 1969). Under the theory applied in *Cuyler v. Adams, supra,* neither would it serve as a basis for denying transfer under I.A.D.

> *Judgment affirmed; appellant to pay the costs; mandate to issue forthwith.*