*Pablo Javier Aleman v. State of Maryland*, Nos. 823 and 2021, September Term, 2018. Argued: May 13, 2019.  Opinion by Gould, J.

**EXTRADITION AND DETAINERS – CONSTITUTIONAL AND STATUTORY PROVISIONS; INTERSTATE AGREEMENT – CUSTODY, TRANSFER AND RETURN OF PRISONER**

Md. Code Ann., Crim. Proc. § 3-112 (2001, 2018 Repl. Vol.), which requires Maryland to commit to the Department of Health a defendant found not criminally responsible by reason of insanity, does not apply to a defendant whose presence in Maryland is a result of the Interstate Agreement on Detainers.  Therefore, pursuant to the Interstate Agreement on Detainers, the defendant must be promptly returned to the state of original incarceration—the "sending state"—once the Maryland charges have been tried. The Interstate Agreement on Detainers specifies that Maryland's custody over such a prisoner is limited to prosecuting Maryland's charges against him, and for all other purposes, the sending state retains custody and jurisdiction over the prisoner.  Accordingly, Maryland does not have sufficient custodial rights over such a prisoner to apply Md. Code Ann., Crim. Proc. § 3-112 (2001, 2018 Repl. Vol.).

**EXTRADITION AND DETAINERS – CONSTITUTIONAL AND STATUTORY PROVISIONS; INTERSTATE AGREEMENT – CUSTODY, TRANSFER AND RETURN OF PRISONER**

Article VI of the Interstate Agreement on Detainers—which states that the Interstate Agreement on Detainers does not apply to a prisoner who is adjudged to be mentally ill—is not triggered when a defendant is found not criminally responsible by reason of insanity after he has already been transferred from the state of incarceration to face charges in another state.  Based on the plain language, context, and purpose of the Interstate Agreement on Detainers, Article VI applies to a defendant adjudicated to be currently mentally ill, not to a defendant found to have been mentally at the time the underlying crime was committed.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 823 & 2021

September Term, 2018

_____

PABLO JAVIER ALEMAN

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Gould,
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Gould, J.

_____

Filed: September 25, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellant Pablo Javier Aleman pleaded guilty to the second-degree murder of his former landlord, for which a Baltimore County jury found him not criminally responsible ("**NCR**"). Ordinarily, a finding of NCR would require the court to commit the defendant to the Maryland Department of Health ("**Department of Health**"), which in turn would admit him to an appropriate facility for the evaluation and treatment of any mental illnesses.

This was no ordinary case. Mr. Aleman had been serving a prison sentence in Ohio when Maryland took temporary custody of him under the Interstate Agreement on Detainers ("**IAD**") for the limited purpose of trying him for the Maryland charges. Under the IAD, once the Maryland trial was over, Maryland's temporary custody over Mr. Aleman ended and it was required to promptly return him to Ohio.

Understandably, Mr. Aleman would prefer to be evaluated and, if necessary, treated for any mental disorders in Maryland rather than be incarcerated in Ohio. To this end, he argues that the statutory obligation to commit him to the Department of Health supersedes any obligation Maryland may otherwise have under the IAD to return him to Ohio. In support of his argument, Mr. Aleman points to a provision of the IAD that specifies that none of its provisions or remedies shall apply to a prisoner who is adjudged to be mentally ill.

This appeal emerges from the intersection of these seemingly conflicting statutes and requires us to consider what happens when a prisoner—who has invoked the benefit of a speedy trial in Maryland made possible by the IAD—is then adjudged to have been mentally ill at the time he committed the crime in that state. We find that here, the IAD still applies to Mr. Aleman notwithstanding the jury's finding of NCR, and Maryland,

having had only temporary custody of Mr. Aleman, must return him to Ohio as required by the IAD. Accordingly, we shall affirm the judgment of the circuit court.

## BACKGROUND

### I. THE UNDERLYING CASE

In early 2016, Mr. Aleman fatally stabbed his former landlord at the latter's home in Baltimore County. He then fled Maryland. Two weeks later, in Ohio, Mr. Aleman had an altercation with the police during which he threatened an officer with a knife. The officer shot Mr. Aleman to disarm and apprehend him. Mr. Aleman was heard to say, "I don't want to kill somebody else. [] I wanted the officer to kill me." An Ohio jury convicted Mr. Aleman of felonious assault, resulting in an eleven-year prison sentence.

Maryland authorities notified Ohio of the charges still pending in Maryland by way of a "detainer." As a result, Mr. Aleman filed a request under the IAD to face trial for the murder charges pending against him in Maryland. In requesting disposition of the Maryland charges, Mr. Aleman signed an agreement stating that he "consent[s] to be . . . returned" to Ohio after trial. Upon his return to Maryland, Mr. Aleman asserted a plea of NCR and then pleaded guilty to second degree murder. From the results of an examination ordered by the circuit court pursuant to Md. Code Ann., Crim. Proc. ("**CP**") § 3-111(a) (2001, 2018 Repl. Vol.),[1] the circuit court determined that Mr. Aleman was competent to stand trial.

---

[1] CP § 3-111(a) states that "[i]f a defendant has entered a plea of not criminally responsible, the court may order the Health Department to examine the defendant to determine whether the defendant was not criminally responsible under § 3-109 of this title and whether the defendant is competent to stand trial."

2

Mr. Aleman's plea of NCR was tried by a jury on May 31, 2018. The jury found that he was NCR at the time of the murder, and the court entered an order committing him to the Department of Health.

Local officials refused to transport Mr. Aleman to the Department of Health facility, and instead "prepared to return him to Ohio" pursuant to the IAD. Mr. Aleman filed a petition for a writ of habeas corpus to challenge his continued confinement in the local detention center, arguing that he should have been committed to the Department of Health instead. The court denied the habeas corpus petition and determined that Mr. Aleman should be sent back to Ohio.[2] The court stayed its prior order of commitment to the Department of Health but enjoined Maryland from returning him to Ohio pending this appeal.[3]

---

[2] Although an appeal generally may not be taken of an order denying habeas corpus relief, an exception exists in extradition cases and in cases where the writ is sought for a purpose other than to challenge the legality of a conviction or sentence. See, e.g., Simms v. Maryland Dep't of Health, 240 Md. App. 294, 312, cert. granted sub nom. Simms v. State, 464 Md. 10 (2019). As Mr. Aleman is not challenging any conviction or sentence but is instead resisting Maryland's attempt to return him to Ohio, the underlying order is appealable. See Statchuk v. Warden, Maryland Penitentiary, 53 Md. App. 680, 683 (1983) (permitting appeal of order denying defendant's petition for writ of habeas corpus to block his extradition under the IAD).

[3] Mr. Aleman subsequently filed a second petition for habeas corpus, which was denied in open court. This petition asked the circuit court to transfer Mr. Aleman to a Department of Health facility pending the disposition of this appeal. Mr. Aleman noted an appeal from the court's denial of his second petition. Mr. Aleman's two appeals have been consolidated. With the issuance of this decision, the second appeal is now moot. See Cane v. EZ Rentals, 450 Md. 597, 611 (2016) (quotation omitted) (stating that an appeal is moot when "any judgment or decree the court might enter would be without effect").

3

## II.    *THE INTERSTATE AGREEMENT ON DETAINERS*

Before addressing the parties' specific arguments, and to place the parties' contentions in their appropriate context, we first briefly address the history and framework of the IAD.  The IAD is an interstate compact designed to facilitate the orderly disposition of detainers. A "detainer" is "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction."  State v. Pair, 416 Md. 157, 161 n.2 (2010) (citing Stone v. State, 344 Md. 97, 108 (1996)).  Prior to the IAD, unresolved detainers were known to complicate the prisoner's ability to fully participate in the rehabilitative, educational, and vocational services and programs offered by the incarcerating institution.  State v. Jefferson, 319 Md. 674, 679-80 (1990) (citing Carchman v. Nash, 473 U.S. 716, 730 (1985)).  Such problems were described by the Court of Appeals in Jefferson:

> [T]he inmate is (1) deprived of an opportunity to obtain a sentence to run concurrently with the sentence being served at the time the detainer is filed; (2) classified as a maximum or close custody risk; (3) ineligible for initial assignments to less than maximum security prisons (i.e., honor farms or forestry camp work); (4) ineligible for trustee status; (5) not allowed to live in preferred living quarters such as dormitories; (6) ineligible for study-release programs or work-release programs; (7) ineligible to be transferred to preferred medium or minimum custody institutions within the correctional system, which includes the removal of any possibility of transfer to an institution more appropriate for youthful offenders; (8) not entitled to preferred prison jobs which carry higher wages and entitle [him] to additional good time credits against [his] sentence; (9) inhibited by the denial of possibility of parole or any commutation of his sentence; (10) caused anxiety and thus hindered in the overall rehabilitation process since he cannot take maximum advantage of his institutional opportunities.

Id.

In 1956, the Council of State Governments drafted what would become the IAD to address such problems. Pair, 416 Md. at 160. The IAD took the form of a congressionally-sanctioned compact between its member states.[4] Id. Maryland adopted the IAD in 1965, and it has been adopted by forty-eight states, the Federal Government, Puerto Rico, the U.S. Virgin Islands, and the District of Columbia. Id. Under the IAD, the states agreed to limit their authority over certain prisoners in exchange for the right to quickly dispose of untried indictments of defendants serving time in other states. See Thomas R. Clark, The Effect of Violations of the Interstate Agreement on Detainers on Subject Matter Jurisdiction, 54 Fordham L. Rev. 1209, 1218 n.46 (1986) ("The IAD is a limitation on the receiving state.").

The IAD is triggered by the filing of a detainer. Once filed, the incarcerating state (the "**sending state**") must notify the prisoner that the detainer has been filed and advise him of his right to a speedy disposition of the underlying charges in the state that filed the detainer (the "**receiving state**"). See, e.g., Md. Code Ann., Corr. Servs. ("**CS**") § 8-405(c) (1999, 2017 Repl. Vol.).

The IAD has two mechanisms by which the prisoner may be transferred to the receiving state. First, Article III (codified in Maryland as CS § 8-405) gives the prisoner the right to demand a speedy disposition of the pending charges. Pair, 416 Md. at 162 (citing Carchman, 473 U.S. at 718-19). If the receiving state does not bring the prisoner to

---

[4] States are free to enter into compacts with other states under which they agree to restrict the exercise of their governmental powers. United States v. Bekins, 304 U.S. 27, 52 (1938).

trial within 180 days of his request, the IAD requires the receiving state to dismiss the charges with prejudice. See CS § 8-405(a).

Second, Article IV (CS § 8-406) permits the receiving state to request the transfer of the prisoner to stand trial. Pair, 416 Md. at 162 (citing Reed v. Farley, 512 U.S. 339, 341 (1994)). Under this provision, the receiving state must start the trial within 120 days of the prisoner's arrival in the receiving state or risk dismissal of the charges. See CS § 8-406(c).

Under either mechanism, the IAD enables the orderly transfer from the sending state to the receiving state. The receiving state obtains only temporary custody of the prisoner for the limited purpose of prosecuting the outstanding charges; for all other purposes, the sending state retains custody over the prisoner. CS § 8-406(d), (g). The receiving state, therefore, must return the prisoner to the sending state promptly after the trial. CS § 8-406(e).

## DISCUSSION

### I. THE PARTIES' CONTENTIONS[5]

Mr. Aleman contends that CP § 3-112—which requires Maryland to commit to the Department of Health any defendant deemed not criminally responsible—prevents Maryland from sending him back to Ohio to serve his sentence there. This statute states, in relevant part:

---

[5] We include in this section the arguments advanced by the parties both in their briefs and at oral argument.

6

> Except as provided in subsection (f) of this section, after a verdict of not criminally responsible, the court shall order the defendant committed to the facility that the Health Department designates for institutional inpatient care or treatment.

CP § 3-112(b).

Pointing to the use of the word "shall" in CP § 3-112, Mr. Aleman argues that Maryland's obligation to commit him to the custody of the Department of Health is not a matter of discretion, and therefore overrides the IAD's requirement that he be returned to Ohio.[6] Mr. Aleman further argues that the IAD no longer applies to him, because it was rendered inapplicable by Article VI of the IAD (CS § 8-408), which states that the IAD does not apply to any defendant who is adjudged to be mentally ill. With the IAD out of the way, Mr. Aleman maintains that Maryland has no choice but to comply with CP § 3-112. In Mr. Aleman's analysis of the plain language in CS § 8-408(b), he sees no reason not to apply it to the jury's finding that he had been insane two years earlier when he had committed the underlying crime. And in any event, Mr. Aleman argues the jury's finding in this case creates an inference that he was mentally ill at the time of the verdict, thus falling within the present tense phrasing used in CS § 8-408(b).

The State counters that Maryland had only temporary custody over Mr. Aleman to begin with, and that this custody ended once he entered his guilty plea. At that point, the

---

[6] As further support, Mr. Aleman observes that in 2018, the General Assembly imposed a degree of urgency by amending CP § 3-112 to require that the defendant be admitted to a Department of Health facility within 10 business days after it receives the order of commitment. See CP § 3-112(e). He contends that the General Assembly did this in recognition of the public safety and due process problems associated with any delays in the prisoner's treatment.

7

IAD required Maryland to send Mr. Aleman back to Ohio under CS § 8-407(e). Any contrary finding would, according to the State, undermine the dual purposes of the IAD of expediting the resolution of untried charges and establishing procedures designed to promote cooperation among the participating states to facilitate the expeditious resolution of detainers. These purposes were fulfilled once Mr. Aleman pleaded guilty to the charges because, at that point, there were no remaining charges looming over Mr. Aleman's head. Accordingly, the State argues its obligation to return Mr. Aleman to Ohio ripened before the jury even came back with its finding of NCR.[7]

As to whether CS § 8-408(b) applies, the State argues that it only applies when a prisoner is still physically located in the sending state, because it is at that point that objections to his transfer based on mental incompetence can be raised and resolved. In Mr. Aleman's case, the State contends, § 8-408(b) could have potentially prevented his transfer from Ohio to Maryland had he been deemed mentally ill at that time, but did not apply once he was transferred to Maryland.

Finally, the State argues that Mr. Aleman waived any rights he might otherwise have had to remain in Maryland when he invoked his rights under the IAD to be transferred to

---

[7] For purposes of applying the IAD, the State views the mental health treatment requirements for defendants found NCR as akin to post-trial sentencing proceedings. In reliance upon U.S. v. Coffman, 905 F.2d 330, 332 (10th Cir. 1990), the State argues that the anti-shuttling provisions of the IAD—prohibiting the receiving state from returning a prisoner to the sending state prior to trial—do not encompass sentencing and should not apply to post-trial mental health treatment for those found to be NCR. Mr. Aleman vehemently contests the State's position, contending that the NCR trial is part of a single consolidated trial pursuant to Md. Rule 4-314. Because we affirm the circuit court's decision on other grounds, we will not address this argument.

Maryland to stand trial. For this proposition, the State relies on Mr. Aleman's written demand to be transferred, which he signed in the presence of two witnesses, that states his "consent to be voluntarily returned to [Ohio in accordance with the provisions of the IAD]."

## II.    ANALYSIS

At bottom, this appeal turns on our interpretation of the relevant provisions of the IAD, as well as CP § 3-112. We review the circuit court's interpretation of those provisions without deference. See Pitts, 205 Md. App. at 486 (applying a non-deferential standard to circuit court's interpretation and application of the IAD). We must determine whether the circuit court's interpretation of the relevant statutes was legally correct without deferring to its conclusions. See, e.g., Smith v. Wakefield, LP, 462 Md. 713, 723 (2019).

We begin with the principles of statutory construction that guide our inquiry. Our objective in interpreting any statute is to understand and implement the General Assembly's intent. See, e.g., Stoddard v. State, 395 Md. 653, 661 (2006) (quotations omitted). We start with the statute's plain language which, if clear and unambiguous, will be enforced as written. Id. at 661 (quotation omitted) (noting that "to determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning"). We also pay attention to the statute's grammar and sentence structure. Mazor v. State Dep't of Correction, 279 Md. 355, 362 (1977) ("As a corollary of the rule that we accord words their ordinary meaning, we must accord sentences an ordinary grammatical structure."). This includes looking at the use of verb tenses. See In re Charles K., 135 Md. App. 84, 98 (2000) ("What we find most significant is the change of tenses within the statutory definition.").

9

If the words are ambiguous, we look at the statute's structure (including its title), context, relationship with other laws, and legislative history, among other indicia of intent. Stoddard, 395 Md. at 662-63 (quotation omitted).[8] Examining the context of the statute includes construing provisions within the same section of the statute harmoniously, if possible. George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay, 197 Md. App. 586, 628 (2011); see also Gardner v. State, 344 Md. 642, 649-50 (1997). In addition, we strive to avoid interpretations that lead to unreasonable or illogical results. Kaczorowski v. Mayor & City Council of Baltimore, 309 Md. 505, 510-16 (1987).

The IAD specifically commands us to construe it "so as to effectuate its purposes." See, e.g., CS § 8-411. And with so many signatories to the IAD, the drafters wisely left no room for any doubt as to its purposes. Thus, Article I, entitled "Findings of party states; purpose of Agreement," provides:

> The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this Agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this Agreement to provide such cooperative procedures.

---

[8] Even if the words are unambiguous, a review of the legislative history may in certain contexts be useful to confirm its interpretation or to rule out "another version of the legislative intent alleged to be latent in the language." Blackstone v. Sharma, 461 Md. 87, 113 (2018) (quotation omitted).

10

Md. Code Ann., CS § 8-403. As stated by the Court of Appeals, the IAD has two main purposes: "(1) to encourage the expeditious disposition of charges; and (2) to provide cooperative procedures among member jurisdictions to facilitate such disposition." Clipper v. State, 295 Md. 303, 307 (1983). These goals serve the interests of both the prisoner and the states. Boyd v. State, 51 Md. App. 197, 202, aff'd, 294 Md. 103 (1982).

### A. Application of CP § 3-112

Armed with both the canons of interpretation as well as the express intent of the IAD, we test the merits of Mr. Aleman's argument that CP § 3-112 requires that he remain in Maryland for treatment, notwithstanding any contrary provisions of the IAD.

On the face of these two statutes, it appears that CP § 3-112 is pulling Mr. Aleman in one direction (to the Department of Health), and the IAD is pulling him in a different direction (back to Ohio). Our task is to harmonize these seemingly inconsistent statutory mandates. See, e.g., Montgomery Cty. v. Robinson, 435 Md. 62, 77 (2013). We can do that by distinguishing between the custodial rights obtained by Maryland and those retained by Ohio.[9]

---

[9] The parties were asked to submit supplemental briefs on the role that the Supremacy Clause in Article VI, Clause 2 of the United States Constitution and its counterpart in Article 2 of Maryland's Declaration of Rights would play in the event this Court found CP § 3-112 to be in conflict with the IAD. Although we appreciate the helpful analysis provided by the parties' counsel, we are able to resolve the case on other grounds and therefore, under the constitutional avoidance doctrine, we do not decide that issue. See Sumpter v. Sumpter, 427 Md. 668, 684 n.10 (2012) (citations omitted) (noting that the doctrine of "[c]onstitutional avoidance" mandates that a court "will not reach a constitutional argument when an issue may be decided on a non-constitutional basis"); see also Wells v. Chevy Chase Bank, F.S.B., 363 Md. 232, 252 (2001) (applying the doctrine to avoid deciding whether a Maryland statute was preempted by federal law).

11

The unstated assumption of, and condition precedent to, the State's ability to apply CP § 3-112 is that Maryland must have custody and jurisdiction over the defendant in the first place. See, e.g., Baker v. Marbury, 216 Md. 572, 574 (1958) (denying habeas petition filed in Maryland by a defendant "in custody" of federal officials in Virginia because the "State cannot act where the prison is not within its borders"). Under the IAD, however, Maryland agreed that it had acquired only temporary custody over Mr. Aleman, and that its temporary custody had been strictly limited to prosecuting the charges against him. See CS § 8-407(d); see also CS § 8-407(a) (the sending state agrees to transfer temporary custody "in order that speedy and efficient prosecution may be had"). Maryland agreed that for all other purposes, Mr. Aleman had remained "in the custody of and subject to the jurisdiction of" Ohio. CS § 8-407(g).[10]

---

[10] CS § 8-407 provides:

(a) In response to a request made under § 8-405 or § 8-406 of this subtitle (Article III or IV of the Agreement), the appropriate authority in a sending state shall offer to deliver temporary custody of the prisoner to the appropriate authority in the state where the indictment, information, or complaint is pending against the prisoner in order that speedy and efficient prosecution may be had. If the request for final disposition is made by the prisoner, the offer of temporary custody shall accompany the written notice required under § 8-405 of this subtitle (Article III of the Agreement). In the case of a federal prisoner, the appropriate authority in the receiving state shall be entitled to temporary custody as provided by this Agreement or to the prisoner's presence in federal custody at the place for trial, whichever custodial arrangement may be approved by the custodian.

(b) The officer or other representative of a state accepting an offer of temporary custody shall present the following upon demand:

12

(1) proper identification and evidence of the officer's authority to act for the state into whose temporary custody the prisoner is to be given; and

(2) a duly certified copy of the indictment, information, or complaint on the basis of which the detainer has been lodged and on the basis of which the request for temporary custody of the prisoner has been made.

(c) If the appropriate authority shall refuse or fail to accept temporary custody of the person, or in the event that an action on the indictment, information, or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in § 8-405 or § 8-406 of this subtitle (Article III or IV of the Agreement), the appropriate court of the jurisdiction where the indictment, information, or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based on the indictment, information, or complaint shall cease to be of any force or effect.

(d) The temporary custody referred to in this Agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations, or complaints that form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction. Except for the prisoner's attendance at court and while being transported to or from any place at which the prisoner's presence may be required, the prisoner shall be held in a suitable jail or other facility regularly used for persons awaiting prosecution.

(e) At the earliest practicable time consonant with the purposes of this Agreement, the prisoner shall be returned to the sending state.

(f) During the continuance of temporary custody or while the prisoner is otherwise being made available for trial as required by this Agreement, time being served on the sentence shall continue to run but good time shall be earned by the prisoner only if, and to the extent that, the law and practice of the jurisdiction that imposed the sentence may allow.

(g) For all purposes other than that for which temporary custody as provided in this Agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending state. Any escape from temporary custody may be dealt with in the same manner as an escape

13

Accordingly, before Mr. Aleman's transfer to Maryland, Ohio had full and exclusive custody of, and jurisdiction over, Mr. Aleman, meaning that the entire bundle of custodial rights and obligations over Mr. Aleman rested with Ohio. When Maryland received Mr. Aleman under the IAD, it acquired just a single strand from that bundle, namely, the right to prosecute Mr. Aleman for the charges underpinning the detainer. See State of N.Y. by Coughlin v. Poe, 835 F. Supp. 585, 590-91 (E.D. Ok. 1993) ("Thus, when read in conjunction with the 'prosecution' allowed by Article V(d), the phrase 'temporary custody' equates with physical control over a prisoner only for the limited period of time involved in adjudicating the charges against him."). Once Maryland exercised its lone custodial right over Mr. Aleman, it had none left. In that sense, for any purpose other than Maryland's prosecution of Mr. Aleman, it was as if Mr. Aleman had never left Ohio. Cf. Stewart v. State, 275 Md. 258, 270 (1975) (for purposes of prosecuting an escaped prisoner,

---

from the original place of imprisonment or in any other manner permitted by law.

(h) From the time that a party state receives custody of a prisoner under this Agreement until the prisoner is returned to the territory and custody of the sending state, the state in which the one or more untried indictments, informations, or complaints are pending or in which trial is being had shall be responsible for the prisoner and shall also pay all costs of transporting, caring for, keeping, and returning the prisoner. The provisions of this subsection shall govern unless the states concerned shall have entered into a supplementary agreement providing for a different allocation of costs and responsibilities as between or among themselves. Nothing herein contained shall be construed to alter or affect any internal relationship among the departments, agencies, and officers of and in the government of a party state, or between a party state and its subdivisions, as to the payment of costs, or responsibilities therefor.

14

"'constructive' custody remains in the place of confinement to which the prisoner had been committed and it is legally indistinguishable from 'actual' custody"). Seen in this light, Maryland does not have, and in fact never had, sufficient custodial rights over Mr. Aleman to have applied CR § 3-112 to him.[11] Thus, CR § 3-112 is no barrier to Maryland's duty under the IAD to return Mr. Aleman to Ohio.

### B. *Application of CS § 8-408*

Relying on CS § 8-408(b), Mr. Aleman denies the continuing applicability of any provision of the IAD once the jury had returned its verdict of NCR. As Mr. Aleman sees it, none of the provisions of the IAD, including its allocation of custodial rights and its requirement to return the prisoner to the sending state upon completion of the prosecution, apply to him now.

CS § 8-408 states:

(a) In determining the duration and expiration dates of the time periods provided in §§ 8-405 and 8-406 of this subtitle (Articles III and IV of the Agreement), the running of these time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.

(b) No provision of this Agreement, and no remedy made available by this Agreement, shall apply to any person who is adjudged to be mentally ill.

Mr. Aleman's interpretation and application of CS § 8-408(b) does not square with either its plain language or the purpose and context behind it. We explain.[12]

---

[11] This opinion does not speak to the nature and extent of Maryland's future custodial rights over Mr. Aleman once he completes his sentence in Ohio.

[12] Because it is not necessary to resolve the issues in this appeal, we do not address the meaning of "mentally ill" as used in CS § 8-408.

15

### 1. The Plain Language of CS § 8-408

The plain language and structure of subsection (b) indicates that it applies only to prisoners who have been adjudged mentally ill in the time frame in which the gears of the IAD have been engaged. This subsection speaks in the present tense with the phrase "who *is* adjudged *to be* mentally ill." CS § 8-408(b) (emphasis added). The use of the present tense signifies that the prisoner's mental illness must be contemporaneous with the adjudication. See, e.g., Worcester Cty. Welfare Bd. v. Wyatt, 219 Md. 507, 511 (1959) ("The use of the present tense imports that the receipt must be contemporaneous with the death in order for the section to apply."). Had the drafters intended for § 8-408(b) to apply to any person adjudged to have been mentally ill at the time the crime had been committed as Mr. Aleman contends, they could have used the present perfect tense to express that intention. See Pitts, 205 Md. App. at 488 (quotation omitted) ("The present perfect tense . . . indicates that an event occurred in the past prior to other events and implies that once the event has occurred . . . certain consequences result"). For example, the drafters could have used the words "who is adjudged *to be or to have been* mentally ill" to indicate that a past mental illness would trigger application of § 8-408(b). That the drafters chose not to use such language suggests that they meant to limit application only to cases of mental illness that exist at the time the IAD has been invoked.

In light of its present tense formulation, Mr. Aleman does not adequately explain how or why the jury's NCR verdict implicates CS § 8-408(b). Mr. Aleman was found to have been NCR at the time he killed his former landlord, on March 17, 2016. As dictated

16

by the NCR statute,[13] the instructions to the jury,[14] and the verdict sheet,[15] the jury's focus was solely on his psychological state at the time of the murder, not at the time of trial. As such, CS § 8-408(b) does not apply here.

---

[13] CP § 3-109(a) states:

A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to:

> (1) appreciate the criminality of that conduct; or

> (2) conform that conduct to the requirements of law.

[14] The circuit court instructed the jury:

You have heard evidence that Mr. Aleman was not criminally responsible for his conduct by reason of insanity. A defendant is not criminally responsible by reason of insanity if at the time of the criminal act because of a mental disorder the Defendant lacked the substantial capacity either, one, to appreciate the criminality of the conduct; or to conform that conduct to the requirements of law.
***
The burden is on the Defendant to establish that he is not criminally responsible. The defense must persuade you by a preponderance of the evidence that at the time of the criminal act as a result of a mental disorder, the Defendant either lacked the substantial capacity to appreciate the criminality of his conduct or lacked the substantial capacity to conform his conduct to the requirements of the law.

[15] The verdict sheet asked the jury:

As to Murder in the Second Degree, do you find by a preponderance of the evidence that the Defendant was not criminally responsible by reason of insanity?

17

Article VI(b) has received scant attention from the state and federal courts, but the cases that have addressed it have also applied the provision to the current mental condition of the prisoner, not the past condition. In State v. Beauchene, 541 A.2d 914 (Me. 1988), relied upon by both parties, the defendant was found NCR by a jury in Maine, escaped Maine's custody, fled to New York and committed crimes there, causing his arrest, conviction, and incarceration in New York. Id. at 915. While in New York, the defendant argued that under the IAD, he could not be returned to Maine to face charges for the escape because, under Article VI(b), the prior finding of NCR some eight years earlier in Maine meant that the IAD no longer applied to him. Id. at 917. In rejecting the defendant's contention, the Supreme Court of Maine held that the "purpose of Article VI(B) . . . is clearly to prevent one state from gaining custody of an individual in another state who *at that time is mentally ill* and therefore unable to defend against the custody change effectively."[16] Id. at 917 (emphasis added). Thus, "any such objection to defendant's

---

[16] Mr. Aleman also cites to Bowman v. Wilson, 514 F. Supp. 403, 409 (E.D. Pa. 1981), rev'd in part, vacated in part, 672 F.2d 1145 (3d Cir. 1982) for the proposition that Article VI(b) applies to prisoners who have been previously acquitted by reason of insanity. We are not persuaded. In Bowman, the issue faced by the court was whether the Army could lawfully take Private Bowman into custody while he was committed to a mental hospital, in derogation of specific orders of the District of Columbia courts. Id. at 405. As part of the Army's argument that Private Bowman lacked standing to challenge his detainment, it argued that he had no independent right to a hearing prior to transfer of custody. Id. at 409. The court noted that such a right could not come from the IAD, because "Private Bowman has been acquitted by reason of insanity of charges against him in the District of Columbia," and thus under Article VI(b), the IAD did not apply. Id. This offhand observation played no part in the court's decision on standing (that Private Bowman could challenge his detainment) or ultimate holding (that the Army had unlawfully defied the D.C. court's orders), and was thus dictum. Stover v. Stover, 60 Md. App. 470, 476 (1984) (citation omitted) (defining "dictum" as "a remark, an aside,

18

transfer by New York should have been raised in the New York courts and is not properly raised here [in the receiving state]." Id. at 917; see also State v. King, 733 P.2d 472, 478 (Or. 1987) (holding that Article VI(b) applies "only to persons presently in the sending state, that the issue should have been raised in Washington and that defendant had already been found able to assist in his defense").[17]

Mr. Aleman's fallback position is that the jury's finding of NCR created an inference that he remained mentally ill through his Maryland trial, and therefore the present tense element of CS § 8-408(b) has been satisfied in this case. We disagree, as this contention would have us disregard two intervening events that cut against such an inference. The first was Mr. Aleman's trial in Ohio where, from the fact that he was found guilty and was sentenced to a term of imprisonment, we can fairly deduce that he either did not plead an insanity defense, or if he did, it was unsuccessful. The second was the competency evaluation that Mr. Aleman underwent in Maryland finding that he was fit to stand trial. On the facts contained in this record, therefore, we do not perceive an adequate basis to make the inferential leap that Mr. Aleman would have us make here.

Moreover, purely as a matter of statutory construction, even if a finding of NCR by a jury in the receiving state could be deemed to have created an inference of a present-day

---

concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication"). We decline to base our decision on such dictum.

[17] Because the facts in this case do not raise the issue, we need not decide whether § 8-408(b) may be triggered if the receiving state finds the defendant unfit to stand trial.

19

mental illness, that alone would not be enough to implicate CS § 8-408(b). By its terms, section 8-408(b) is triggered by an adjudication of an actual, present mental illness, not an adjudication that at best creates an *inference* of a present mental illness. Thus, § 8-408(b) does not apply here.[18]

---

[18] Mr. Aleman cites two cases to bolster his assertion that a verdict of not criminally responsible "supports an inference of continuing mental illness." The two cases are Lynch v. Overholser, 369 U.S. 705, 717 (1962) and Jones v. United States, 463 U.S. 354, 366 (1983). Both cases involved due process challenges to the District of Columbia's mandatory commitment statute following verdicts of not guilty by reason of insanity. The essence of the defendants' due process arguments in both cases was that a finding of NCR did not establish a present mental illness, and therefore the defendants were deprived of due process when they were committed as a result of that finding. Neither case held, however, that an adjudication of NCR at the time the crime was committed constitutes an adjudication that the defendant is *currently* mentally ill. In fact, the earlier case, Lynch, undermines this proposition. There, the defendant did *not* plead an insanity defense and denied being currently mentally ill. Nevertheless, from the evidence put on by the prosecution, the judge in the bench trial found him not guilty by reason of insanity. 369 U.S. at 709, 719-20. The Supreme Court avoided the question of whether the commitment statute satisfied due process. Id. at 709-10. Instead, the Court interpreted the broadly-written mandatory detention statute as being applicable only to defendants who plead the insanity defense, not to those who do not. Id. at 713-15.

In the latter case, Jones, the Court found that a finding of NCR provided Congress a reasonable basis to infer that a defendant remains mentally ill through the trial, thereby justifying his continued detention. 463 U.S. at 366. In discussing the inference of continued mental illness, however, the Court was speaking only to the reasonableness of Congress's rationale for the mandatory detention statute, and acknowledged that the relevance of a jury's finding of NCR to the defendant's current mental state depended on the specific facts of the case. In that regard, the Court stated:

> The precise evidentiary force of the insanity acquittal, of course, may vary from case to case, but the Due Process Clause does not require Congress to make classifications that fit every individual with the same degree of relevance.

463 U.S. at 366. The Supreme Court's decisions in Jones and Lynch, therefore, do not support Mr. Aleman's position.

20

## 2. *The Purpose and Structure of the IAD*

The underlying purpose and structure of CS § 8-408(b) and the other provisions of the IAD support our conclusion that § 8-408(b) does not apply here. The provisions of the IAD, as explained above, carefully and precisely allocate the custodial rights and obligations between the sending and receiving states. As applied here, Maryland acquired only temporary custody for the limited purpose of prosecuting Mr. Aleman, and was required to transfer him back to Ohio once that limited purpose had been fulfilled. Ohio retained custody and jurisdiction over Mr. Aleman for every other purpose, and it had the right to Mr. Aleman's prompt return once Maryland concluded its prosecution of him. See CS § 8-407(e). Yet, under Mr. Aleman's theory, Maryland could leverage § 8-408(b) to expand the nature and scope of its custody over Mr. Aleman while contracting the nature and scope of Ohio's custody. Such a result cannot be reconciled with, and in fact would undermine, the dual objectives of the IAD to expedite the resolution of untried indictments and to foster cooperation among the participating states.[19] See Boyd, 51 Md. App. at 206 ("[t]he Agreement, as we have seen, is a comprehensive one, and all of its parts have to be read together, in harmony, in order to carry out its dual purpose").

---

[19] For the same reason, we are skeptical that even if § 8-408(b) had applied to Mr. Aleman under these circumstances, Maryland would have been permitted to keep Mr. Aleman instead of sending him back to Ohio. Both the IAD's purposes and underlying framework suggest that once the IAD ceases to apply to a defendant, the sending state should be restored to the entire bundle of custodial rights that it had before the receiving state took temporary custody. But that is a question for another day.

21

Mr. Aleman argues that the IAD's purpose is to facilitate the rehabilitation of prisoners—a goal that would be better served by keeping him in Maryland to undergo mental health treatment. The rehabilitative aspect of the IAD's purpose, however, is not to promote the rehabilitation of prisoners in a general abstract sense, but rather "to minimize the adverse impact of a foreign prosecution on rehabilitative programs of the *confining jurisdiction*," see Pair, 416 Md. at 170 (emphasis added) (quoting Painter v. State, 157 Md. App. 1, 17 (2004)), not of the receiving jurisdiction. See State v. Smith, 316 Md. 223, 229 (1989) (emphasis added) (quoting Cuyler v. Adams, 449 U.S. 433, 448-49 (1981)) ("a primary purpose of the Agreement is to protect prisoners *against whom detainers are outstanding*"); Hoss v. State, 266 Md. 136, 143 (1972) (emphasis added) (citation omitted) (the purpose of IAD is "to promote and foster prisoner treatment and rehabilitation programs *by eliminating the uncertainties which accompany the filing of detainers*"). In this case, the IAD served the purpose of preventing the looming cloud of the Maryland detainer from interfering with Mr. Aleman's ability to successfully avail himself of whatever rehabilitative or treatment programs or facilities existed in Ohio.

Further, the structure of CS § 8-408 demonstrates that it was not intended to apply to inmates, like Mr. Aleman, who have not been adjudged to be currently mentally ill. Subsection (b) comes right after the tolling provisions in subsection (a), which states:

> In determining the duration and expiration dates of the time periods provided in §§ 8-405 and 8-406 of this subtitle (Articles III and IV of the Agreement), the running of these time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.

22

Construing these two subsections together, CS § 8-408 generally addresses the possibility that the defendant is unable to stand trial or otherwise exercise rights under the IAD, with current (as opposed to prior) mental illness being one such reason. A mentally ill prisoner could not invoke his right to demand a transfer and even if he could, the receiving state could not try the prisoner until his competency was restored. Section 8-408(b) therefore, prevents the gears of the IAD from being engaged when the receiving state's ability to timely try the prisoner—at the risk of being compelled to dismiss the charges with prejudice—has been impaired. As one commentator explained:

> The Agreement specifically withholds the benefit of its provisions from one who has been adjudged mentally ill. Since one who is mentally ill cannot conduct his defense and therefore cannot be tried, he is not allowed to take advantage of a law under which failure to try him might result in dismissal of the charges against him.

Interstate Agreement on Detainers, 32 St. John's L. Rev. 141, 142 (1957). In this way, CS § 8-408 aligns with the larger purpose of the IAD as a whole—the expeditious and cooperative disposition of charges among several jurisdictions. See Clipper, 295 Md. at 307.

## CONCLUSION

Pursuant to the IAD, Maryland acquired temporary custody over Mr. Aleman for the limited purpose of prosecuting its charges against him. The limited nature of its custodial rights precluded Maryland from applying CP § 3-112 to Mr. Aleman notwithstanding the jury's finding of NCR. And, as Mr. Aleman had not been adjudicated to be mentally ill at the time he had exercised his right under the IAD to be transferred to Maryland to stand trial or at any time thereafter, there was no basis under CS § 8-408(b) to

23

terminate the application of the IAD to Mr. Aleman. We therefore affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR  BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**